# EXHIBIT 19

```
 1                IN THE UNITED STATES DISTRICT COURT

 2             FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

 3

 4   PENNYMAC LOAN SERVICES, LLC, )

 5             Plaintiff,         )

 6   vs.                         )  No. 2:19-cv-00193-KS-MTP

 7   SITCOMM ARBITRATION         )
     ASSOCIATION, MARK MOFFETT,
 8   SANDRA GOULETTE, RONNIE     )
     KAHAPEA, MARK JOHNSON, KIRK
 9   GIBBS, and ALARIC SCOTT,    )

10             Defendants.       )
     _____

11

12

13

14

15      REMOTE VIDEO RECORDED DEPOSITION OF SANDRA GOULETTE

16                    Laurel, Mississippi

17                 Tuesday, December 8, 2020

18                        Volume I

19

20

21

22   Reported by:
     LISA ANDREASEN
23   CSR No. 9584

24   Job No. 4367213

25   PAGES 1 - 86

                                              Page 1
```

```
 1      A      That is what I recall, yes.  But, again, I

 2   was not the arbitrator on that matter.  So, you

 3   know, I wouldn't be able to give you a hundred

 4   percent specifics on that, no.

 5      Q      Okay.  And you said that there's four parts    11:32:17

 6   that are required for this application, and it's the

 7   contract, the fee, the proof of notice, all of which

 8   Mr. Johnson had, and also a request for dispute

 9   resolution upon complaint.  What is in the request

10   for dispute resolution upon complaint?  Can you       11:32:41

11   describe that document for us?

12      A      Sure.  The document basically lists the

13   parties, and it lists what the parties have done as

14   far as primarily the claimant getting in touch with

15   the respondent to potentially resolve the dispute.    11:33:04

16   And if the respondent fails to comply or respond, I

17   should say, not comply, there's an arbitration

18   clause in there that specifically gives the claimant

19   the opportunity to file for arbitration.

20      Q      All right.  Now, you mentioned that you       11:33:37

21   looked at one other application in preparation for

22   this deposition, and that was Ronnie Kahapea's

23   application.  What did you find in Ronnie Kahapea's

24   application, if you can remember?

25      A      All of the applications that we receive at    11:33:56
```

Page 32

```
 1    both of the parties.  And so, you know, it's a

 2    matter of them following through with and being

 3    responsible and doing what they're supposed to do,

 4    and I'm just kind of like somewhat the overseer of

 5    that.  You know, if I get an email that a document      11:52:50

 6    hasn't been received, then I take care of it

 7    immediately.  You know, that's -- I have nothing to

 8    do with the hearings or anything of that nature.

 9        Q    Okay.  Well, let's get into your role at

10    Sitcomm.  Because I think that's kind of what you're   11:53:10

11    talking about right now.  When did you first

12    become -- become involved with Sitcomm Arbitration

13    Association?

14        A    I became involved with Sitcomm in January

15    of 2019.                                               11:53:31

16        Q    And how did you become involved with

17    Sitcomm?

18        A    I was informed by a friend of a friend that

19    they were looking for arbitrators.  Now, at that

20    time, there was a different director, which was not    11:53:58

21    a good situation.  So he after quite a few months, I

22    think by June of that year of 2019, he had left.

23    And unfortunately the founder of the organization

24    was predisposed and unable to get back into the

25    scene to -- to do anything about it, you know.  And    11:54:49
```

Page 42

1    so, I guess, because of my -- my background and my

2    degrees, I was just asked to, you know, just do kind

3    of like an oversee type of thing and make sure that

4    everybody was doing the right thing and not -- you

5    know, and not making absurd, you know, decisions and    11:55:26

6    whatnot.

7           I'm in the process of going back to law

8    school, and, you know, I made it very clear from the

9    beginning that I would be doing this temporarily

10   just to -- you know, just to help really.  I would     11:55:58

11   imagine that the founder of the organization will be

12   back within -- or I should say by the end of this

13   month.

14       Q    And who is that founder?

15       A    That is Brett Jones, J-o-n-e-s.              11:56:30

16       Q    Is Brett Jones known by any other names?

17       A    Legally, no.  Nickname-wise, yes.

18       Q    Okay.  What are his -- what are his

19   nicknames?

20       A    That would be Eeon, E-e-o-n.                 11:57:00

21       Q    Any other nicknames?

22       A    Nickname?

23       Q    Correct.

24       A    I -- nickname, I don't know, but prior

25   to -- prior to -- prior to Brett Jones his name was    11:57:34

                                                  Page 43

1       Q    Okay.  Anyone else on that committee?

2       A    Rod.  Did I tell you Rod?

3       Q    Yes.

4       A    I don't -- I don't -- I don't remember his

5    last name.                                          12:52:54

6       Q    Okay.

7       A    Oh, Alaric, A -- Alaric, you know, Alaric,

8    A-l-a-r-i-c, Scott, Junior.

9            MR. POWERS:  Just a second.  For the

10   record, ma'am, did you mention an individual named   12:53:26

11   Eric Peeler as part of your answer?

12           THE WITNESS:  Eric Taylor.

13           MR. POWERS:  Taylor.  I'm sorry.  Thanks

14   for the clarification.

15           THE WITNESS:  You're welcome.             12:53:39

16   BY MS. CHANG:

17      Q    Is there anyone else you can recall that's

18   on that committee?  I know you've listed a number of

19   names at this point.

20      A    No, ma'am, not that -- not that I can        12:53:54

21   recall.

22      Q    Okay.  So going back, Mr. Jones nominates

23   you to be the new director of Sitcomm Arbitration

24   Association in July or August of 2019.  And then

25   does that nomination then go to this committee of    12:54:13

Page 57

1    people to vote on your nomination?

2         A    Yes, ma'am, it does.  And I can honestly

3    say that all of these people on this committee

4    they -- I can't think of one of them that has any

5    kind of college background.  I can't think of any       12:54:47

6    kind of -- I can't think of any one of them that has

7    any paralegal or law background either so --

8         Q    Okay.  And you have a paralegal

9    certification, I believe, Ms. Goulette.

10        A    Yes, ma'am.                                    12:55:14

11        Q    And when did you get that certification?

12        A    1998.

13        Q    And do you take continuing legal education

14   courses in order to keep that certification up to

15   date?                                                    12:55:31

16        A    No.  As soon as I received that, I did get

17   my master's degree in public administration and

18   government law.

19        Q    And when did you get that master's degree?

20        A    In 1994.                                       12:55:49

21        Q    And what institution did you receive the

22   degree from?

23        A    Murray State University.

24        Q    I'm sorry.  Could you spell that for me.

25        A    Murray State University in Murray,             12:56:04

Page 58

1      Q     And how long has Denise Brown been your

2   roommate?

3      A     For three years.

4      Q     All right.  So going back, you haven't been

5   enrolled in another law school since Suffolk, but          01:13:44

6   you're currently practicing to take your LSATs

7   again.  Is that -- is that an accurate assessment of

8   where you are in that path?

9      A     Absolutely.  Although, over the past of the

10  course five years -- the past five years, more and        01:14:07

11  more law schools are not requiring L -- you know,

12  the test to get in, especially out in California.

13     Q     Okay.  So going back to when you joined

14  Sitcomm Arbitration Association in January 2019,

15  what was your title at that time?                          01:14:29

16     A     Just arbitrator secretary.

17     Q     So secretary to an arbitrator but not an

18  arbitrator; correct?

19     A     Right.  I scheduled.  I scheduled hearings.

20  I took care of accounting.  I sent out notices, sent      01:14:48

21  out contracts, and I was -- I was scheduling

22  arbitration hearings, yeah.

23     Q     And how many arbitrators did you act as

24  secretary for at that time?

25     A     At that time we actually had nine             01:15:17

Page 69

1    arbitrators.

2        Q    And you did all of the scheduling and

3    notices for all nine?

4        A    Correct.

5        Q    Were you the only secretary to the          01:15:35

6    arbitrators at Sitcomm at that time?

7        A    Correct.

8        Q    Have there been any other secretaries since

9    January 2019 other than you?

10       A    No.                                          01:15:47

11       Q    So when you then became the director of

12   Sitcomm Arbitration Association sometime in, let's

13   say, August or September of 2019, did you continue

14   with all of those responsibilities that you had as

15   secretary to the arbitrators?                        01:16:05

16       A    Absolutely, yes.  Because I did not feel

17   and nor did Mr. Jones that anyone, you know, could

18   handle those responsibilities, and, you know, it

19   just wouldn't have -- it just wouldn't have worked

20   out.                                                 01:16:30

21       Q    And how did your responsibilities increase

22   at the time that you became director in August or

23   September of 2019?

24       A    I would be responsible for handling any

25   complaints.                                          01:16:54

                                                          Page 70

```
1        Q    What do you mean by --

2        A    -- and customer --

3        Q    Go ahead.  Go ahead.

4        A    That's okay.  Any customer service

5   questions, inquiries, comments, anything about          01:17:05

6   arbitration procedure, how long does it take, you

7   know, things of that nature, which, you know, I

8   could answer depending upon how the question was

9   posed.  Certain questions in regard to, you know,

10  what's my arbitrator going to do, I could not answer    01:17:33

11  those questions.  What can I do once I, you know,

12  receive my award?  I could not answer those

13  questions.  I made it very clear to every single

14  client that I was not privy to that information nor

15  could I disclose that kind of information to them.       01:18:06

16       Q    And when you joined Sitcomm Arbitration

17  Association in January 2019, what was your salary at

18  that time?

19       A    My salary -- I was considered a

20  subcontractor.  I didn't have a salary.                  01:18:23

21       Q    How were you paid, if at all?

22       A    Well, basically individuals as

23  subcontractors are paid according to the work that

24  they complete.  So if -- you know, if they're asked

25  to answer ten emails, then Mr. Jones would, you          01:18:55
```

Page 71

```
 1    compensated maybe $10 for each application and the

 2    whole processing of that application.

 3         A    Yeah.  Once everything was submitted, yes.

 4         Q    All right.  You testified that there were

 5    situations where, you know, those four prerequisites    01:23:35

 6    in the application were not complete in some

 7    fashion, and you had to send the file back to the

 8    client, basically reject it and not -- and not pass

 9    it along to an arbitrator.  In those situations,

10    were you still paid $10, or were you not paid         01:23:53

11    because it was a rejected file?

12         A    No, I wasn't paid.  Because it wouldn't

13    have even gone out.  The hearing notifications would

14    not have gone out.  And so what we would do is just

15    out of like a common courtesy type of situation, you   01:24:12

16    know, we would say, okay, well, thank you for

17    submitting your application.  Thank you for

18    submitting the contract, but we still need the proof

19    of service, and then we can send it out.  And then

20    once it's sent out, that person would receive the     01:24:31

21    $10 compensation.

22         Q    Got it.  Now, when you became director in

23    August or September of 2019, did your compensation

24    structure change?

25         A    Not a whole lot.                            01:24:50
```

Page 74

1        Q    So you got a promotion -- go ahead.

2        A    Right now because Brett has these three

3    organizations and he's incapacitated, to say the

4    least, I have been helping him with all three of the

5    organizations.  Over the past six months, you know,    01:25:26

6    people have -- people have not answered emails

7    correctly and kind of let, you know, the clients'

8    papers, you know, slip, things like that.  So, you

9    know, I let him know on every occasion, but he also

10   wants me to let them know that, you know, until it      01:26:01

11   gets fixed and until the customer is happy, they

12   will not be receiving their grant funds.

13       Q    Now, at the time that you became the

14   director, did they hire any additional, meaning

15   Brett Jones, did he hire anyone additional to assist    01:26:26

16   you with operating Sitcomm Arbitration Association?

17       A    No, ma'am.

18       Q    Now, let's talk about the arbitrators.  You

19   said that at the time that you started working as a

20   secretary for Sitcomm Arbitration Association there     01:26:55

21   were nine arbitrators.  Do you recall their names?

22       A    Yes.  We had Timothy Simpson, and he was

23   located in Nashville, Tennessee.  Steven -- it will

24   come to me.  Keisha Jones, she is in Georgia.  There

25   was another lady named Tracy, and she was in            01:27:55

Page 75

1                      I, the undersigned, a Certified Shorthand

2       Reporter of the State of California, do hereby

3       certify:

4                      That the foregoing proceedings were taken

5       before me at the time and place herein set forth; that

6       any witnesses in the foregoing proceedings, prior to

7       testifying, were administered an oath; that a record of

8       the proceedings was made by me using machine shorthand

9       which was thereafter transcribed under my direction;

10      that the foregoing transcript is a true record of the

11      testimony given.

12                     Further, that if the foregoing pertains to

13      the original transcript of a deposition in a Federal

14      Case, before completion of the proceedings, review of the

15      transcript [ ] was [ ] was not requested.

16                     I further certify I am neither financially

17      interested in the action nor a relative or employee of

18      any attorney or any party to this action.

19                     IN WITNESS WHEREOF, I have this date

20      subscribed my name.

21      Dated:  December 22, 2020

22

23                                _Lisa Andreasen_

24                                LISA ANDREASEN

25                                CSR No. 9584, RPR

Page 86

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE CENTRAL DISTRICT OF MISSISSIPPI

3

4    PENNYMAC LOAN SERVICES, LLC,        )   Case No.
                                         )   2:19-cv-00193-KS-
5            Plaintiff,                  )   MTP
                                         )
6    vs.                                 )
                                         )
7    SITCOMM ARBITRATION                 )
     ASSOCIATION, MARK MOFFETT,          )
8    SANDRA GOULETTE, RONNIE             )
     KAHAPEA, MARK JOHNSON, KIRK         )
9    GIBBS, and ALARIC SCOTT,            )
                                         )
10           Defendants.                 )
     _____)

11

12

13

14              VIDEO-RECORDED VIDEOCONFERENCE

15            DEPOSITION OF SANDRA GOULETTE

16                  Laurel, Mississippi

17              Wednesday, January 20, 2021

18                      Volume II

19

20

21   Reported by:

22   ROCHELLE HOLMES

23   CSR No. 9482

24   Job No. 4418214

25   PAGES 87 - 247

                                            Page 87

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE CENTRAL DISTRICT OF MISSISSIPPI

 3

 4    PENNYMAC LOAN SERVICES, LLC,        )   Case No.
                                          )   2:19-cv-00193-KS-
 5              Plaintiff,                )   MTP
                                          )
 6    vs.                                 )
                                          )
 7    SITCOMM ARBITRATION                 )
      ASSOCIATION, MARK MOFFETT,          )
 8    SANDRA GOULETTE, RONNIE             )
      KAHAPEA, MARK JOHNSON, KIRK         )
 9    GIBBS, and ALARIC SCOTT,            )
                                          )
10              Defendants.               )
                                          )
11    _____  )

12

13

14

15        Deposition of SANDRA GOULETTE, testifying from

16    Laurel, Mississippi, taken on behalf of Plaintiff, via

17    videoconference, beginning at 10:03 a.m. and ending at

18    2:45 p.m. on Wednesday, January 20, 2021, before

19    ROCHELLE HOLMES, Certified Shorthand Reporter No. 9482,

20    Certified Realtime Reporter No. 0123.

21

22

23

24

25
```

Veritext Legal Solutions
866 299-5127

```
 1   APPEARANCES:

 2

 3   For Plaintiff:

 4

 5       BLANK ROME LLP

 6       BY:  CHERYL S. CHANG, ATTORNEY

 7       2029 Century Park East, 6th Floor

 8       Los Angeles, CA 90067

 9       (424) 239-3472

10       Chang@blankrome.com

11       (Appearing via videoconference.)

12       --and--

13       UPSHAW, WILLIAMS, BIGGERS & BECKHAM, LLP

14       BY:  HARRIS F. POWERS III, ESQ.

15       309 Fulton Street

16       Post Office Drawer 8230

17       Greenwood, Mississippi 38935-8230

18       (662) 455-1613

19       Hpowers@upshawwilliams.com

20       (Appearing via videoconference.)

21

22   VIDEOGRAPHER:  SCOTT SLATER

23

24

25
```

Page 89

```
 1        A    Correct.

 2        Q    All right.  A guy named Mark who you

 3   referred to as Gonzo.  Was he an arbitrator?

 4        A    Not for certain, 100 percent certain.  He

 5   could have been, yes.                                  10:08AM

 6        Q    Do you know what Gonzo's last name is?

 7        A    I do.  I do not.  Sorry.  I don't have that

 8   information.

 9        Q    Fair enough.  And, you know, you if think

10   about it at any point in time you can bring it back    10:08AM

11   up.

12             Did Tracy's last name come back to you while

13   you were thinking?

14        A    No, sir, not yet.

15        Q    All right.  And there was also an individual  10:09AM

16   identified as Steven, but last name unknown in your

17   prior testimony.  I just wanted to clear that up.

18        A    Davis.  That would be Steven Davis.

19        Q    Okay.  And do you know where Mr. Davis is

20   located?                                               10:09AM

21        A    I do not.

22        Q    We know that Mark Moffett is an arbitrator

23   for Sitcomm; correct?

24        A    At one time, yes.

25        Q    Okay.  We know that Kirk Gibbs is an         10:09AM
```

Page 98

```
 1    arbitrator for Sitcomm; right?

 2         A    Correct.

 3         Q    All right.  Are there any other arbitrators

 4    for Sitcomm that we haven't identified?

 5         A    I don't believe so, no.                    10:09AM

 6         Q    Is Rance Magee an arbitrator?

 7         A    As of recently, yes.  Sorry.

 8         Q    Okay.  And his name is a name that's come up

 9    in these proceedings which is why I ask.

10         A    Okay.                                      10:10AM

11         Q    Where is Rance Magee?

12         A    I believe he's in Michigan.

13         Q    Okay.  And how long has he been an

14    arbitrator?

15         A    I could not tell you that with certainty.  10:10AM

16         Q    Gotcha.  And tell me a little bit about

17    Rance Magee and his background.

18         A    As far as?

19         Q    How about this -- that's a very open-ended

20    question and probably a little unfair.               10:10AM

21              How did you come to know Rance Magee?

22         A    I have -- I was associated with Mr. Magee

23    for -- let's see.  Sorry.  I'm having problems with

24    dates and memory since I was sick.

25         Q    Let me turn the question a little bit.      10:11AM
```

Page 99

```
 1        A    Correct.  To my knowledge, yes.

 2        Q    And there is a vast gulf of physical

 3   distance between Laurel, Mississippi and the state of

 4   Michigan; right?

 5        A    Correct.                              10:13AM

 6        Q    All right.  So did you have in-person

 7   dealings with Rance Magee prior to your affiliation?

 8        A    Never have met Mr. Magee, no.

 9        Q    Understood.  Did you have professional

10   association with Mr. Magee prior to your affiliation   10:13AM

11   with Sitcomm?

12        A    I don't believe so.  Again, like I said, I

13   have never met Mr. Magee, so I don't believe so, no.

14        Q    Do you know what qualifies Rance Magee to be

15   an arbitrator?                                  10:13AM

16        A    Again, I would have to, like, seek out that

17   information because I did not appoint Mr. Magee to be

18   an arbitrator.

19        Q    Okeydoke.  And who would possess that

20   information other than Rance Magee?             10:13AM

21        A    That would be the founder of the

22   organization, Brett Jones.

23        Q    All right.  And going back to my limited

24   purpose in these questions and just where they steered

25   me, can you think of any other arbitrators other than  10:14AM
```

Veritext Legal Solutions
866 299-5127

1       Q     Is anyone else with you in your office?

2       A     No.

3       Q     Okay.  So I actually want to follow on a

4   couple of questions that Mr. Powers asked and then I

5   will continue from where we left off on December 8th.    10:17AM

6             You mentioned that you occasionally serve as

7   an arbitrator; is that right?

8       A     Uh-huh.  Yes.

9       Q     And when were you first appointed to be an

10  arbitrator?                                               10:17AM

11      A     That would have been in January of 2019.

12      Q     Was that also the timeframe in which you

13  were named the director of Sitcomm Arbitration

14  Association?

15      A     No.                                             10:17AM

16      Q     When were you made the director of Sitcomm

17  Arbitration Association?

18      A     That would have been sometime during the

19  late summer, I believe, of 2019 or I should say during

20  the summer.                                               10:17AM

21      Q     And who was it that named you the director

22  of Sitcomm?

23      A     That would be the founder of the

24  organization, Mr. Jones.

25      Q     Brett Jones?                                    10:18AM

                                              Page 104

1        A     Yes, ma'am.

2        Q     And who appointed you an arbitrator in

3   January of 2019?

4        A     That would be the founder as well,

5   Mr. Jones.                                          10:18AM

6        Q     Did you have to apply to become an

7   arbitrator with Sitcomm?

8        A     Yes.

9        Q     And what was the application process?

10       A     It was filling out an application along with   10:18AM

11   a resume and a statement or a paragraph, I should say,

12   of pertinent information or background experience.

13       Q     And do you still have that application and

14   resume?

15       A     I am not certain.  I would have to go check    10:18AM

16   for that.

17       Q     All right.  After the deposition, could you

18   check for me, and if you do still have either the

19   application or the resume that you submitted to

20   Mr. Jones, could you please produce that to us by       10:19AM

21   email?

22       A     Sure.

23       Q     Thank you, Ms. Goulette.  Do you recall if

24   there were any prerequisites to becoming an arbitrator

25   at Sitcomm?                                              10:19AM

                                           Page 105

```
 1        A    That was quite a while ago, so I don't

 2   recall off the top of my head.  But I would imagine

 3   that there were.

 4        Q    Do you know if you had to be an attorney to

 5   become an arbitrator?                              10:19AM

 6        A    I don't believe so, no.

 7        Q    Do you know if you had to have gone to law

 8   school to become an arbitrator?

 9        A    I do not believe so, no.

10        Q    As you sit here today, can you recall      10:19AM

11   anything that Mr. Jones identified as a requirement

12   before becoming an arbitrator with Sitcomm?

13        A    I don't off the top of my head, and I

14   definitely do not want to speak on his behalf.  So

15   that process that he went through at the time I would  10:20AM

16   not have known about anyway, so I definitely could not

17   give you that information, ma'am.

18        Q    Do you recall when you submitted your

19   application and your resume to Mr. Jones for becoming

20   an arbitrator with Sitcomm?                        10:20AM

21        A    Do I recall -- can you say that again?

22        Q    Yes.  Do you recall the date that you

23   submitted your application to become an arbitrator

24   with Sitcomm?

25        A    That would have probably been between     10:20AM
```

1       Q    So you were appointed arbitrator by

2  Mr. Jones, he notified you by telephone sometime in

3  January 2019; is that accurate?

4       A    I believe so, yeah.  It could have been

5  December of 2019, but somewhere in that timeframe,      10:24AM

6  yes.  December 2018, January 2019.

7       Q    Okay.  Got it.  Thank you for clarifying

8  that.  Now, these trainings that occurred three to

9  five times a week, who conducted the training?

10       A    That would be Mr. Jones.                     10:24AM

11       Q    And in these trainings, was there anyone

12  else in attendance other than yourself and Mr. Jones?

13       A    There were several other people in

14  attendance.  I could not tell you exactly who was

15  there, but yes, there were several other people in     10:24AM

16  attendance.

17       Q    And of the people that were in attendance,

18  is it one of the nine to ten people that you

19  identified as arbitrators with Mr. Powers?

20       A    May have been, yes.  Uh-huh.                 10:24AM

21       Q    Could there have been anyone else in those

22  training sessions?

23       A    Well, I could not verify that 100 percent.

24  Again, you know, it was done virtually similar to what

25  we're doing now.  So I would not be able to give you   10:25AM

                                                    Page 109

1    that information 100 percent accuracy.

2        Q    Okay.  And when you say it was conducted

3    virtually, was it done by Zoom or another application?

4        A    Something similar to this, yes.  But I don't

5    know which program or software, whatever you would      10:25AM

6    call this, it was.  I wouldn't know that.

7        Q    Okay.  And during those trainings, did you

8    see the other people that were in the trainings or did

9    you just see Mr. Jones?

10       A    I do not recall seeing anyone at the time,    10:25AM

11   no.

12       Q    Now, going back to the meetings that you had

13   with Mr. Jones in the process of applying to become an

14   arbitrator, in those three to five meetings, were

15   those also done virtually or were they done in person?  10:25AM

16       A    They were done virtually as well.

17       Q    Can you describe generally, if you can

18   recall, what was discussed in the training with

19   Mr. Jones?

20       A    Well, there was quite a bit of information.   10:26AM

21   That's kind of broad.  But for the most part, we did

22   discuss the Federal Arbitration Act in depth.

23       Q    Anything else?

24       A    It was, you know, to my recollection, it was

25   always a business meeting environment.  So I can't     10:26AM

Page 110

1  you conduct the arbitration by video as we are doing

2  today?

3      A    That would be accurate, yes.

4      Q    How many arbitration awards have you issued

5  as an arbitrator for Sitcomm?                          10:36AM

6      A    Again, I couldn't tell you that with

7  certainty because I can't recall right now how many

8  arbitrations I conducted.

9      Q    Would it be a fair estimate to say more than

10  five arbitration awards that you have issued for       10:37AM

11  Sitcomm?

12      A    It's possible, yes.  I would have to check

13  on that, Ms. Chang.

14      Q    Okay.  Could you please check and then

15  produce both the arbitration awards and if there is a  10:37AM

16  space in the deposition you can also write in the

17  number of arbitration awards that you've issued?

18      A    Sure.  I can check.

19          (Information Requested:_____

20  _____.)     10:37AM

21      Q    BY MS. CHANG:  Okay.  You testified that

22  after you became an arbitrator or were appointed an

23  arbitrator by Brett Jones either in December 2018 or

24  January 2019, that you also became a director of

25  Sitcomm either in late summer or the end of 2019.      10:37AM

                                             Page 117

```
 1              Is that accurate?

 2      A    It would be -- yes, sometime during the

 3   summer of 2019, yes.

 4      Q    Okay.  What did your role as director

 5   involve?                                          10:38AM

 6      A    Primarily, I respond to emails of

 7   individuals inquiring for services or answer any

 8   potential questions about services.  Things of that

 9   nature.

10      Q    And how did you receive inquiries from     10:38AM

11   customers about services?

12      A    Primarily through email.

13      Q    Is there an email, a general email account

14   that people can email to ask about the services at

15   Sitcomm?                                          10:39AM

16      A    Yes.  I believe so, yes.  Located right on

17   the website.  So yes.

18      Q    What is that general email account?

19      A    For questions?

20      Q    Yes.                                      10:39AM

21      A    That would be support@saalimited.com.

22      Q    Would all emails to support@saalimited.com

23   come to you following your appointment as director of

24   Sitcomm?

25      A    No.                                       10:39AM
```

                                              Page 118

1        Q    Who would they go to, if you know?

2        A    They actually went to several different

3    people.  So I could not, like, whoever mostly that --

4    whoever responded to that email account and everything

5    associated with that, that was a rotation type of          10:39AM

6    schedule that several people did that throughout any

7    time period, so I couldn't give you 100 percent

8    accuracy on that either.

9        Q    Okay.  So just so I have this right, there

10   is a schedule of people that would monitor the            10:40AM

11   support@saalimited.com email account?

12       A    No.  I wouldn't say that there is a

13   schedule.  It was just kind of a rotation that

14   everybody knew, you know, it would be their

15   responsibility to take care of that, answering that      10:40AM

16   email.

17       Q    How many people were on this rotation if you

18   know in 2019?

19       A    Well, that would have been anyone who was

20   appointed as an arbitrator.                               10:40AM

21       Q    Okay.  Got it.  So in 2019 when you became

22   an arbitrator, say approximately January 2019, do you

23   know how many people were in rotation to monitor the

24   support@saalimited.com email account?

25       A    In January of 2019, that may have been five     10:41AM

                                                    Page 119

1    or six different people, yes.

2         Q    What are the names of the five or six

3    different people?

4         A    So that would be myself, Mr. Alan Hunt,

5    Mr. Brett Jones, Timothy Simpson, and Steven Davis.      10:41AM

6         Q    Did that rotation of people monitoring that

7    email account change at any time in 2019?

8         A    Well, it changed every time, you know,

9    somebody else was going to be assuming that role, yes.

10        Q    So any time a new arbitrator was appointed    10:42AM

11   by Mr. Jones, they would be added into the rotation?

12        A    Not immediately, no.

13        Q    Was there a process by which someone was

14   added into the rotation for monitoring the email

15   account?                                                 10:42AM

16        A    I believe that, you know, they had to be

17   with the organization for a while before they were

18   just permitted to jump on the email account.

19        Q    Okay.  Was it after their training with

20   Brett Jones was completed?                               10:42AM

21        A    That's quite possible, yes.  Uh-huh.

22        Q    Did they have to conduct a number of

23   arbitrations before they were added to the email

24   account?

25        A    I don't believe that that was the case, no.   10:43AM

Page 120

1      Q    Okay.  So once a customer emailed about the

2   services at Sitcomm and emailed that email account,

3   what was the process by which you would get a client

4   scheduled for an arbitration?

5      A    The process would have been a completely      10:43AM

6   different email account.

7      Q    Okay.  So this support@saalimited email

8   account was just for inquiries about service,

9   questions, general information; is that accurate?

10      A    Correct.                                       10:43AM

11      Q    If a customer wanted to actually begin using

12   Sitcomm services, what was the process by which they

13   retained Sitcomm?

14      A    Well, I believe that, you know, as outlined

15   on the website, I believe that they were informed to    10:44AM

16   contact application@saalimited.com and therefore --

17   and then they would have to give all of the pertinent

18   information as well in order to have any kind of

19   services provided for them.

20      Q    And what is the pertinent information that     10:44AM

21   they would need to provide in emailing

22   application@saalimited.com?

23      A    Well, they would have to fill out the

24   application that's located on the website.  Any kind

25   of proof of service that they wanted to give to the    10:44AM

                                              Page 121

1    arbitrator, any type of contractual information that

2    they had, and a request for dispute resolution as well

3    which is all on the website.

4        Q    Anything else that they would have to

5    provide?                                          10:45AM

6        A    Well, as a claimant seeking services, you

7    know, they could provide whatever information they

8    wanted to give us, so I couldn't tell you, you know,

9    beyond that, what, you know, specifically, people

10   would provide because everybody does something       10:45AM

11   differently.

12       Q    And in 2019 after you became an arbitrator,

13   who was monitoring this email account?

14       A    That would have been, I believe, Mr. Jones

15   and Mr. Hunt.                                      10:46AM

16       Q    Anyone else?

17       A    That I recall right now, no, huh-uh.

18       Q    After you became director at Sitcomm, did

19   you begin also monitoring this email account?

20       A    At times, yes.                            10:46AM

21       Q    And were you one of the people that

22   processed applications and determined if the client

23   would be able to proceed with Sitcomm?

24       A    You just broke up and the video just stopped

25   for a second, so can you please repeat that question?  10:46AM

                                              Page 122

1     Q    Yes.  Absolutely.  Were you one of the

2   people that reviewed applications and determined

3   whether or not the client could proceed with Sitcomm

4   for an arbitration?

5     A    After I became director, yes.                10:47AM

6     Q    But prior to that, you did not have that

7   responsibility?

8     A    That I recall, no.  I don't recall ever

9   having that responsibility prior to that.

10    Q    All right.  So after you became director,      10:47AM

11   how many applications did you process for Sitcomm?

12    A    I couldn't tell you that information, Ms.

13   Chang, without looking and verifying it with

14   certainty.  I just couldn't tell you.

15    Q    After this deposition, could you go review     10:47AM

16   your records and produce the actual applications that

17   you processed for Sitcomm?

18    A    Okay.

19    Q    That's a yes?

20    A    I should be able to.  Again, you know, I       10:47AM

21   wouldn't -- you want the actual applications of other

22   clients is what you are saying, to produce the

23   physical application of the clients?

24    Q    Yes.

25    A    No, I would not be able to give you that       10:48AM

Page 123

```
 1        A    Okay.

 2        Q    Now, you mentioned that clients can come to

 3   the Sitcomm website and send emails to these email

 4   addresses and find applications as well.  Other than

 5   the Sitcomm website, how does Sitcomm advertise to      10:51AM

 6   clients?

 7        A    I could not answer that question as well

 8   with accuracy.

 9        Q    Why not?

10        A    Because, to my knowledge, right now, anyway,  10:51AM

11   there's no specific way that any, or any way that any

12   kind of advertisement is conducted.  In other words,

13   there is nothing to my knowledge that is in a

14   newspaper or a phonebook or anything of that nature.

15   I could not tell you that with certainty because I'm    10:52AM

16   not aware of it.

17        Q    Okay.  Well, as far as you are aware, how do

18   customers of Sitcomm find Sitcomm?

19        A    I believe that a majority of it might be

20   amongst customers, per se.  You know, to my knowledge,  10:52AM

21   I don't know of any other way that -- I guess what I'm

22   trying to say is to my knowledge I couldn't tell you,

23   you know, with certainty how that transpired.

24        Q    Okay.  So just so I am getting clarity on

25   your response, are you saying that most customers come  10:53AM
```

Page 126

```
 1    to Sitcomm by word-of-mouth from other customers?

 2         A    I would tend to think so, yes.

 3         Q    And why would you tend to think so?

 4         A    Because individuals who are seeking an

 5    arbitral process, you know, just as they would be with   10:53AM

 6    AAA or any other organization, you know, to my

 7    knowledge, those organizations don't necessarily

 8    advertise, either.  However, you know, for someone to

 9    have an arbitration conducted, they would have to be

10    named as the arbitrator in some kind of contractual      10:53AM

11    agreement or some kind of arbitration agreement would

12    have to exist.

13              So as far as advertising or word-of-mouth or

14    anything of that nature, I could not tell you with

15    certainty how that takes place.                          10:54AM

16         Q    Well, in your experience as an arbitrator

17    and director of Sitcomm, do you know from speaking to

18    clients how they found Sitcomm?

19         A    No, ma'am, I don't.  Because I do not speak

20    personally to clients.  I just don't do it.             10:54AM

21         Q    You don't speak personally to clients even

22    when you are serving as an arbitrator for their

23    arbitration?

24         A    Well, if there's -- no, that would be

25    considered pro se information.  And no, I generally do   10:54AM
```

Page 127

```
 1   not do that.
 2        Q    When you conduct arbitrations, do you speak
 3   to the parties?
 4        A    Very -- it's very generalized, yes.  We
 5   speak as of the dates and time and things of that        10:55AM
 6   nature, but I don't have a conversation with any of
 7   the individuals involved.
 8        Q    All right.  Do you know if Mr. Jones does
 9   any advertising for Sitcomm?
10        A    I'm not aware of him conducting any          10:55AM
11   advertising for Sitcomm; no, ma'am.
12        Q    Let's go back to your work as an arbitrator.
13             Can you kind of give us an idea of how you
14   conduct arbitrations?  Let's say you have an
15   arbitration that's scheduled for, you know, tomorrow     10:55AM
16   morning.  How does that arbitration process go either
17   virtually or in person?  And you are saying mostly
18   they took place virtually, so describe for me how an
19   arbitration proceeds.
20        A    An arbitration would proceed just very       10:55AM
21   similar to this proceeding today.  So there is a time
22   -- or any court proceeding, I should say, especially
23   in the era of COVID and a lot of court proceedings are
24   virtual as well.  There is a date and a time for the
25   parties to meet together, and when that doesn't         10:56AM
```

Veritext Legal Solutions
866 299-5127

```
 1    happen, you know, similar to a deposition or something

 2    of that nature, then, you know, that's the date and

 3    time for the hearing for everyone to show up.

 4         Q    Now, when that doesn't happen, what happens

 5    next?                                                    10:56AM

 6         A    Well, what I was getting at is, you know,

 7    it's very similar to this proceeding.  So when that

 8    doesn't happen, like you were questioning before about

 9    when the respondent does not show up, just like in a

10    hearing, the hearing is going to go on, and the          10:57AM

11    arbitration is still going to be conducted.  So it

12    still is conducted.

13         Q    Okay.  So describe to me how you conduct an

14    arbitration where the respondent does not appear.

15         A    Well, the entire hearing is recorded and      10:57AM

16    that's something that is implemented at our

17    organization.  So the entire hearing is recorded and

18    all information that is given to us is stated so that

19    we have -- hold on one second because I have to cough

20    -- sorry about that.                                     10:58AM

21         Q    That's all right.  If you need a break, let

22    me know.

23         A    My throat's dry.

24              So anyway, all of that information is up to

25    the arbitrator, you know, to conduct that hearing at     10:58AM
```

Veritext Legal Solutions
866 299-5127

```
 1    the time.
 2         Q    So I'm just trying to get a sense of how
 3    these arbitration hearings go when you're serving as
 4    an arbitrator and the respondent doesn't show.  Do you
 5    take evidence from the claimant?  Do you ask for          10:58AM
 6    documents?  Just describe for me generally how that
 7    process goes.
 8         A    Well, it's -- yes, it's requested of
 9    individuals if they haven't provided information.
10    However, at the time, it's also requested in a manner    10:59AM
11    so that respondents know as well.  So I wouldn't just
12    be speaking with one party either way in any instance.
13              So in other words, everything that the
14    claimant would give to me or -- well, I'm only
15    speaking of myself, so anything that they would give     10:59AM
16    to me, I would make sure that the respondent received
17    as well.
18         Q    So in the situation where respondent doesn't
19    appear at the arbitration at the stated date and time,
20    but the claimant provides you with documentation and     10:59AM
21    evidence and testimony, you would then send that
22    documentation, evidence, testimony to the respondent?
23         A    No.  That information is not something I
24    would send to the respondent.  The respondent would
25    receive any contractual agreement that I have been       11:00AM
```

Page 130

1    presented with, okay.  An opportunity to attend the

2    hearing as well as the claimant, via notice, and any

3    information such as proof of service or request for

4    disposition or anything of that nature that I was

5    given by the claimant, I would make sure that that        11:00AM

6    information was given to the respondent as well.

7        Q    And how far in advance of the actual

8    arbitration hearing do you give notice to the

9    respondent?

10       A    I believe it's ten days.  I'll say ten to        11:00AM

11   14 days.

12       Q    So is that the first time that you contact

13   the respondent after a client has been approved to

14   proceed with an arbitration with Sitcomm?

15       A    For the notice of hearing, is that what you      11:01AM

16   are referring to specifically?

17       Q    Okay.  Let's start with the notice of

18   hearing.  Yes.  Is that the first time you notify the

19   respondent of the hearing itself?

20       A    Yes.  Yes.  I believe so.  Yes.               11:01AM

21       Q    And prior to giving notice of the hearing,

22   is there any other communication that Sitcomm sends to

23   the respondent?

24       A    Well, no.  There isn't, no.

25       Q    So you give the respondent ten days' notice      11:01AM

                                                    Page 131

```
 1    of an actual arbitration being filed against them and

 2    ten days to prepare for a hearing?

 3         A    That's correct.

 4         Q    And have you ever received a request to

 5    continue the date of the arbitration hearing because    11:01AM

 6    it's not a date that is available to the respondent to

 7    appear?

 8         A    Yes, I have.

 9         Q    And have you accommodated those requests to

10    move the arbitration hearing date?                      11:02AM

11         A    Absolutely, yes.

12         Q    In the situation where the respondent

13    doesn't appear, do you as the arbitrator allow the

14    claimant to put on witnesses and provide testimony?

15         A    If they would like to do so, sure.           11:02AM

16         Q    Go ahead, sorry.

17         A    Sure.  If they would like to do so.  Excuse

18    me.

19         Q    And in those situations where they provide

20    testimony, you say that these proceedings are          11:02AM

21    recorded; correct?

22         A    Yes, they are.

23         Q    So every arbitration that you conducted,

24    there is a video recording of those proceedings?

25         A    Yes.  However, I don't have access to all of 11:03AM
```

Page 132

1        Q     And in those arbitrations, do you have any

2    role in confirming that the matter before you is

3    actually subject to arbitration?

4        A     Sure.  I do.

5        Q     And you do that in each of the matters in        11:31AM

6    which you serve as the arbitrator?

7        A     Correct.

8        Q     But you testified at the last deposition

9    that that wasn't your role.

10       A     Well, again, if you are referring to this        11:31AM

11   matter with Pennymac, it wasn't my role.  That was

12   specifically up to the arbitrator of those matters,

13   and neither was I present at those matters.

14       Q     But isn't it your testimony today that the

15   matters for which you served as an arbitrator you       11:31AM

16   would make a determination as to whether or not that

17   matter was subject to arbitration?

18       A     Of course, yes.  There would have to be

19   something in the contractual agreement, yes.

20       Q     Can you describe to me what you look for to      11:32AM

21   make that determination that the matter is subject to

22   arbitration?

23       A     Well, there has to be an arbitration clause,

24   you know, between the parties that states that they

25   decide or agree to resolve their issue via              11:32AM

                                           Page 143

```
 1    arbitration.
 2         Q    And if that arbitration clause does not
 3    exist -- strike that.
 4              The arbitration clause you are looking for,
 5    it has to exist in the contract between the claimant      11:32AM
 6    and the respondent; am I correct?
 7         A    Correct.
 8         Q    And if that arbitration clause does not
 9    exist in that contract between the claimant and the
10    respondent, what do you do?                              11:32AM
11         A    There is really nothing I can do as an
12    arbitrator.  I was not -- it's not been agreed to
13    between the parties that they will resolve their
14    dispute via arbitration.
15         Q    So do you decline to take that client for     11:33AM
16    arbitration?
17         A    Well, personally, of course, I would do
18    that.  Yes.  And I would just, you know, basically let
19    both of the parties know that that was something that
20    I was not able to do.                                    11:33AM
21         Q    Have you reviewed the contract between
22    Pennymac and Mr. Johnson or the contract between
23    Pennymac and Mr. Kahapea?
24         A    No, I have not.
25         Q    So at no time in your role as director of     11:33AM
```

Page 144

1            Do you have records of that kind?

2      A     Again, I may have some, yes.

3      Q     Okay.  Well, after this deposition, please

4  look for them and produce them to us.

5            No. 6, "All documents that refer or relate     11:38AM

6  to fees, expenses or charges for your arbitration

7  services and other services."

8            Do you have documents of this kind?

9      A     No.  I don't have any of those

10  documentations, no.                                      11:38AM

11     Q     Okay.  I believe, and I may be

12  misremembering this, but I think you did testify as to

13  the range of fees that a customer is charged for

14  conducting a Sitcomm or participating in a Sitcomm

15  arbitration.  Do you know what those fees are?          11:38AM

16     A     Yes.  And they are on the website, yeah.  So

17  anybody can locate those fees, yes.

18     Q     Okay.  So tell me what the fees are, just

19  break them down for me.  When the customer first

20  applies for an arbitration, is there a fee?             11:39AM

21     A     When a customer applies for arbitration,

22  yes, there is a fee of $500.

23     Q     And that's the same for every client, no

24  matter what?

25     A     It depends upon how many individuals are       11:39AM

                                              Page 148

```
 1    involved.  So it would range from anywhere from 500 to
 2    I believe it's 900.
 3         Q    And is 900 the most fees that could be
 4    charged for that application process?
 5         A    I believe so.                              11:39AM
 6         Q    So is it 500 for one respondent and then you
 7    add additional amounts for additional respondents?
 8         A    I believe that is how it was originally set
 9    up.  I was not involved in that decision making
10    process so I couldn't tell you with 100 percent        11:40AM
11    certainty that that's how all that information was
12    decided.  But in looking at it and viewing it on the
13    website, that's just the information that I came to,
14    yes.
15         Q    Okay.  Now, is the fee structure any          11:40AM
16    different today than it was when it was set up
17    originally?
18         A    No, not to my knowledge.
19         Q    Okay.  So it stayed the same.  Are there any
20    additional fees that are paid if an arbitration is     11:40AM
21    actually conducted?
22         A    No, not to my knowledge.
23         Q    So would it be accurate to say that in order
24    for a client to participate in an arbitration with
25    Sitcomm, they pay anywhere from 500 to $900 and no     11:41AM
```

Page 149

1    but in your role as director it does sound like you

2    speak to Mr. Jones periodically.  Are there any tasks

3    that he is unable to do for Sitcomm since he is

4    incarcerated that he asks you to take care of?

5         A    I don't -- really, that I recall, no, not      12:53PM

6    specifically.

7         Q    Now, scrolling down on this page, there are

8    a couple of screens of information.  It says

9    "Arbitrations through SAA limited, $550 and up."

10            Do you see that?                                 12:53PM

11        A    Yes.

12        Q    Is that the fee for initiating an

13   arbitration with Sitcomm?

14        A    I thought -- to my knowledge it was 500, but

15   again, I haven't seen this page before, so.            12:53PM

16        Q    To your knowledge, might have the filing fee

17   gone up in the last year?

18        A    To my knowledge the fee has not changed.

19        Q    Okay.  Now, on the direct deposit

20   information screen in the middle, it says, "You may     12:54PM

21   deposit the funds at any Bank of America either in

22   person or through wire transfer," and then it gives a

23   Sitcomm account number and routing number.  Is this

24   still the Sitcomm account number with Bank of America?

25        A    I don't believe so.  I don't have any          12:54PM

                                                       Page 185

1    a claimant to create a new contract with a respondent?

2         A    No.

3         Q    Have you ever had occasion to advise a

4    customer to create a new contract with the respondent

5    in order to create an arbitration provision?          12:57PM

6         A    No.

7         Q    Do you know of anyone at Sitcomm, either

8    another arbitrator or officer or employee, that has

9    advised a customer to create a new contract with a

10   respondent in order to have a arbitration provision?   12:57PM

11        A    No, ma'am.

12        Q    Is there any place in the Sitcomm website

13   that gives customers instructions on how to create a

14   new contract with a creditor, for example, in order to

15   have an arbitration provision?                         12:57PM

16        A    To my knowledge, no.  Again, I didn't, you

17   know, create that and so off the top of my head, no.

18        Q    Now, you mentioned that the first time that

19   you contact a respondent in a case is when you send

20   out a notice of arbitration hearing.  How are those    12:57PM

21   hearing dates set by you when you're the arbitrator?

22        A    I guess that I would send out the

23   notification at least 14 or 15 days prior to any kind

24   of commitment to show up at a hearing.

25        Q    And do you select that date based on the     12:58PM

                                              Page 187

```
 1    availability of the claimant and yourself to attend on

 2    a particular day?

 3         A    No.  I don't ask the claimant.  I don't

 4    correspond with the claimant at all.

 5         Q    So you just set a date and you send out        12:58PM

 6    notice to all parties involved?

 7         A    Correct.

 8         Q    And you don't talk to the claimant

 9    beforehand about selecting the date or the time?

10         A    No.                                            12:58PM

11         Q    And you are saying you don't talk to the

12    claimant at all prior to the arbitration hearing?

13         A    Correct.

14         Q    Is that the policy of all the arbitrators

15    that work for Sitcomm?                                   12:59PM

16         A    Yes.

17         Q    So all Sitcomm arbitrators are advised not

18    to talk to the claimants prior to the actual

19    arbitration hearing?

20         A    Correct.                                       12:59PM

21         Q    One an arbitration hearing is set, who sends

22    out the notices?  Let's say, for an arbitration that

23    you are conducting as an arbitrator, do you personally

24    send out the notices?

25         A    Yes.                                           12:59PM
```

                                                    Page 188

1        Q    And how do they get sent?  Is it sent by

2   regular mail?  Certified mail?  Fed Ex?  UPS?

3        A    Mail, United States Postal Service mail.

4        Q    And it's not certified or return receipt

5   requested?                                          12:59PM

6        A    I believe it's sent with tracking number so

7   no not certified but two days tracking number.

8        Q    And who decides where the arbitration will

9   be held?

10        A    That would be the arbitrator.              01:00PM

11        Q    And in your arbitrations, where do you

12   usually set the arbitration?

13        A    Where I'm located in Laurel, Missouri.

14        Q    I'm sorry.  I missed that last part.

15        A    In Laurel, Missouri.                       01:00PM

16        Q    Now, you testified earlier that all of the

17   arbitrations that you have a conducted, at least, have

18   been done virtually.  Is that accurate?

19        A    Yes.

20        Q    And that was even before the COVID pandemic?  01:00PM

21        A    Pretty much, probably, yes.

22        Q    Did you -- did you conduct any arbitrations

23   in person prior to March 2020?

24        A    Prior to March of 2020?

25        Q    When I identify that month, that's when     01:01PM

Page 189

 1   respondent?

 2       A    They would have to forward it to that

 3   individual via email.

 4       Q    And they would reach out to, in this case,

 5   Mr. Gibbs to get the arbitration hearing information?    02:00PM

 6       A    Correct.

 7       Q    Do you know if Mr. Gibbs at this time in

 8   2019 was conducting arbitrations in person or

 9   virtually?

10       A    I couldn't tell you in regards to this        02:00PM

11   specific instance because I am not aware of whether

12   the parties attended or they didn't attend.

13       Q    Got it.  All right.  I'm going to show you

14   another document that we will mark as Exhibit 14.

15            (Exhibit 14 was marked for identification     02:01PM

16             and is attached hereto.)

17       Q    BY MS. CHANG:  All right.  This is a Final

18   Arbitration Award in that same matter that we were

19   just looking at which is Johnson versus Pennymac Loan

20   Services, et al.                                        02:01PM

21            Have you seen this document before?

22       A    Yes, I believe so.

23       Q    When is the first time that you saw this

24   document?

25       A    Probably back in 2019.                        02:01PM

                                              Page 218

```
 1        Q     And what circumstances -- strike that.

 2              Under what circumstances were you shown this

 3    document or how did you come to see it?

 4        A     I'm sure that if this document was prepared

 5    by Mr. Gibbs as the arbitrator, yeah, okay.          02:02PM

 6        Q     So, go on.  You said if this award was

 7    prepared by Mr. Gibbs as the arbitrator.

 8        A     Right.

 9        Q     Is that why you would have seen it?

10        A     Yeah, probably.                            02:02PM

11        Q     Did you review all of Mr. Gibbs' arbitration

12    awards?

13        A     No. I don't have time to read every single

14    thing that Mr. Gibbs puts into his awards.  I just

15    don't.  And I wasn't a part of it, so I'm not a part  02:02PM

16    of his decision making process.

17        Q     Okay.  Can you describe to me what situation

18    it was that you would have reviewed this document

19    because it seems like you've seen it before and you

20    saw it in 2019?                                       02:03PM

21        A     Right.  And I don't remember specifically

22    off the top of my head why, but I just know that I've

23    seen it.  I'm just trying to be honest with you.

24        Q     Okay.  I appreciate that, thank you.

25              I'm going to highlight a portion here.  Do   02:03PM
```

                                                    Page 219

1     you see paragraph Roman Numeral X, "Respondents failed

2     to respond to the contractual agreement mailed with

3     proof of service by claimant on April 1, 2015 which

4     constituted an act of tacit acquiescence."

5              Do you see that?                              02:04PM

6        A    Yes.

7        Q    Do you know what that means?

8        A    Yes.  We've already discussed that.

9        Q    I'm asking with specific reference to this

10    award since you do recall seeing it before, do you     02:04PM

11    know what it means in this context?

12       A    It means that obviously Mr. Gibbs came to

13    some kind of determination that the claimant had a

14    sufficient amount of evidence presented or proof of

15    service or whatever the situation was.  Again, I was    02:04PM

16    not there.  And the respondents failed to acknowledge

17    it.

18       Q    Based on this term, "tacit acquiescence to a

19    contractual agreement that was mailed with proof of

20    service," are you saying that by failure of Pennymac    02:05PM

21    to respond to the contractual agreement that

22    Mr. Johnson presumably mailed to them, that they

23    agreed to a brand new agreement?

24       A    No.  I can't make that determination because

25    I was not there, nor was I the arbitrator.             02:05PM

                                                    Page 220

1      Q     Okay.

2      A     So I'm just giving you the understanding of

3   what I'm reading.

4      Q     Okay.  And then in the bolded part of the

5   award, it says, "Furthermore, the arbitrator finds        02:05PM

6   that the amount stipulated to be paid to the claimant

7   is $2.25 million from respondent Pennymac Loan

8   Services as stipulated according to the terms of the

9   contractual agreement as agreed to by the parties."

10          Do you see that?                                   02:05PM

11      A     Yes.

12      Q     Based on what you've read so far, and I know

13   you weren't part of the arbitration, do you read this

14   to mean that through tacit acquiescence Pennymac

15   agreed to pay Mr. Johnson $2.25 million?               02:06PM

16      A     That's what I'm reading.  But again, I don't

17   know if this was something that was agreed to between

18   the parties.  I couldn't tell you that because I was

19   not privy to that information.

20      Q     As a arbitrator for Sitcomm, would you only     02:06PM

21   approve of a $2.25 million award to a claimant if the

22   parties agreed to that?

23      A     Yeah.  They would have to agree to that in

24   some kind of contractual agreement, yes.

25      Q     And in the absence of an agreement like that    02:06PM

                                                         Page 221

1    in a contract, you wouldn't award an amount like this

2    to a claimant, is that accurate?

3        A    Correct.  That would be completely

4    unreasonable, yes.

5        Q    On the last page of this arbitration award,    02:07PM

6    it says, "So awarded, be it so this 21st day of

7    October 2019.  Arbitration hearing conducted by Kirk

8    Gibbs.  Hearing site, Lilburn, Georgia.  And then it's

9    signed by Kirk Gibbs as arbitrator, and then there is

10   a committee member signing underneath it.  Is that    02:07PM

11   your signature?

12       A    Yes.

13       Q    And do you recall signing this arbitration

14   award?

15       A    Yes, I do.                                    02:07PM

16       Q    Now, there is a seal next to it that's

17   Sitcomm Arbitration Association Corporate Seal and I

18   think it says 2015 Wyoming.  Did you stamp that

19   corporate seal on the award?

20       A    I don't recall if I did or not, ma'am.        02:08PM

21       Q    Is every arbitration award that is issued by

22   Sitcomm also signed by a committee member in addition

23   to the arbitrator?

24       A    No, not every arbitration award, no.

25       Q    Is there a reason why some are signed by      02:08PM

                                                Page 222

1        A    Correct, I did not.

2        Q    Do you know why you signed the Notice of

3    Arbitration Hearing for Mr. Kahapea's arbitration?

4        A    I don't.  And I -- I don't.  And I don't

5    usually sign my name that way anyway, so I don't know        02:16PM

6    what that is, ma'am.

7        Q    So do you think that this was signed without

8    your authorization then?

9        A    I can't say for certain.  I guess I'm a

10   little -- I just don't know.  I would have to check         02:16PM

11   into that to be honest with you.

12       Q    Okay.  Let me show you another document that

13   we will mark as Exhibit 19.

14       A    Okay.

15            (Exhibit 19 was marked for identification          02:16PM

16             and is attached hereto.)

17       Q    BY MS. CHANG:  All right.  This is All

18   Purpose Proof of Service that contains a final

19   arbitration award.

20       A    Okay.                                               02:16PM

21       Q    And it was presumably sent to Mr. Kahapea,

22   Pennymac Loan Services, and Plaza Home Mortgage.  And

23   it shows that you, Sandra Goulette, as director of

24   Sitcomm, certify that the arbitration was conducted by

25   Mark Moffett.  And then it's signed by you on the           02:17PM

                                              Page 226

```
1    second page.

2            Is that your signature?

3    A    Yes.

4    Q    And do you recall signing this in 2019?

5    A    Yes.                                    02:17PM

6    Q    And there appears to be a seal next to your

7    name on the left, but it's really illegal.  Do you

8    recognize this as the Sitcomm seal?

9    A    I do not recognize that, no, ma'am.

10   Q    But that is your signature and you do recall  02:17PM

11   signing this document?

12   A    That is my signature, yes, ma'am.

13   Q    Do you recall any of the details of the

14   Kahapea arbitration award?

15   A    No.  Again, I was not involved in the       02:18PM

16   Kahapea arbitration hearing, and I didn't make any

17   determination in the matter, no.

18   Q    So to the extent that you sign these

19   arbitration awards as director, what is it that you

20   are certifying if not the contents of the arbitration  02:18PM

21   award itself?

22   A    I'm just really certifying that the

23   arbitration was conducted by that individual, like

24   basically what it says right there, that it was

25   actually conducted.  That's all.                02:18PM
```

Page 227

1       CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

2           I, Rochelle Holmes, the undersigned, a Certified

3   Shorthand Reporter of the State of California, do

4   hereby certify:

5           That the foregoing proceedings were taken

6   before me via videoconference; that any witnesses in

7   the foregoing proceedings, prior to testifying, were

8   administered an oath; that a record of the proceedings

9   was made by me using machine shorthand which was

10  thereafter transcribed under my direction; that the

11  foregoing transcript is a true record of the testimony

12  given.

13          Further, that if the foregoing pertains to the

14  original transcript of a deposition in a Federal Case,

15  before completion of the proceedings, review of the

16  transcript [X] was [ ] was not requested.

17          I further certify I am neither financially

18  interested in the action nor a relative or employee

19  of any attorney or any party to this action.

20          IN WITNESS WHEREOF, I have this date subscribed

21  my name.

22  Dated:  January 24, 2021

23

24                  *Rochelle Holmes*

                    Rochelle Holmes

25                  CSR No. 9482, CCRR No. 0123

                                            Page 247

SAA-XM7D8FG8839F7-KH773629DH6S                                        A170A-MCJ-001

## SITCOMM ARBITRATION ASSOCIATION
### P.O. BOX 41964
### CHARLESTON, SOUTH CAROLINA 29423
### + 1 (877) 631-1722

**Website: saalimited.com**                                    **Email: support@saalimited.com**

## IN THE MATTER OF ARBITRATION BETWEEN THE FOLLOWING PARTIES:

| | |
|---|---|
| Mark C. Johnson<br><br>CLAIMANT(S),<br><br>v.s.<br><br>Penny Mac Loan Services, LLC ET AL.,<br><br>RESPONDENT(S) | Contract No.: SAAMCJ-A170A-102119-KG<br><br>9 UNITED STATES CODES<br><br>§1, §2, AND §9<br><br>*COMMON LAW*<br><br>SEALED. |

## FINAL ARBITRATION AWARD

Breach or violation of required contract terms:

      The parties have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this Title. If no court is specified in the agreement of the parties, then

EXHIBIT

14

SAA-XM7D8FG8839F7-KH773629DH6S                          A170A-MCJ-001

such application may be made to the United States court in and for the district within which such award was made. Notice of the application shall be served upon the adverse party and thereupon the court shall have jurisdiction of such party as though they had appeared generally in the proceeding. If the adverse party is a resident of the district within which the award was made, such service shall be made upon the adverse party or their attorney as prescribed by law for service of notice of motion in an action in the same court. If the adverse party shall be a nonresident, then the notice of the application shall be served by the marshal of any district within which the adverse party may be found in like manner as other process of the court.[1]

Arbitrator's Name:      Kirk Gibbs

Hearing Location:       Lilburn, Georgia

This Arbitrator has considered the Claimant's request for dispute resolution on complaint and finds as follows:

Jurisdictional Allegations:

1.      This Arbitrator has Subject Matter Jurisdiction, SMJ; as acknowledged by 9 U.S. Codes §1, §2, §9; 28 U.S. Code §§ 1346; and the established common law not limited to the following specifics:

a.      That Claimant(s)

i.      Mark C. Johnson, Et Al is a citizen of the state of Virginia; and

b.      The Respondent(s)

i. Penny Mac Loan Services, LLC ET AL.,

---

[1]July 30, 1947, Ch. 392, 61 Stat. 672.

SITCOMM ARBITRATION ASSOCIATION

SAA-XM7D8FG8839F7-KH773629DH6S                    A170A-MCJ-001

1. It is uniformly settled that a court's right to vacate or modify an arbitration award is extremely limited. That said, many state arbitration statutes, as well the Federal Arbitration Act and the Uniform Arbitration Act, allow correction or modification for an evident miscalculation in the arbitrator's award. See, e.g., 9 U.S.C. § 11(a).

2. Many state courts have held that an award can be corrected only for "miscalculations" that appear on "the face of the award" and for mathematical errors that are "patently clear."[2]

3. This Arbitrator, Kirk Gibbs; has been appointed in the above referenced matter on behalf of SITCOMM Arbitration Association to settle and resolve any and all disputes arising thereunder by arbitration under the authority of the Federal Arbitration Act.

4. An arbitration hearing was held on Date at which time the Arbitrator reviewed all contractual agreements and documentary evidence submitted by the parties in this matter.

5. This Arbitrator fully considered and granted the Claimant's request for summary disposition and further considered all the evidence in reference to the Contract Item No. 45671-77FGHJK-k23459671-445678904©, its terms, promises, and obligations; as well as the facts in support as presented during the arbitration of this controversy.

6. On or about June 6, 2015 the Claimant and Respondent(s) entered into a written, irrevocable, binding contractual agreement which included an arbitration clause. Both parties entered into a legally binding contractual relationship and this Arbitrator found that no fraud in the inducement to contract or fraud in the factum was present. Thus, Respondent(s) are bound to the terms and obligations agreed upon and imposed on them. To date, the Respondent(s) have failed to respond to the Claimant and this Arbitrator has found that the Respondent(s) were not willing to participate in the hearing.

---

[2] *Fogal v. Stature Const., Inc.*, 294 S.W.3d 708 (Tex. App. 2009); *Jones v. Summit Ltd. P'ship Five*, 635 N.W.2d 267 (Neb. 2001); *Cole v. Hiller*, 715 So. 2d 451 (La. Ct. App. 1998); *Foust v. Aetna Cas. & Ins. Co.*, 786 P.2d 450 (Colo. App. 1989); *Severtson v. Williams Constr. Co.*, 173 Cal. App. 3d 86 (1985); *Morrison-Knudsen Co., Inc. v. Makahuena Corp.*, 675 P.2d 760 (Haw. 1983); *Carolina Virginia Fashion Exhibitors, Inc. v. Gunter*, 255 S.E.2d 414 (N.C. Ct. App. 1979).

SAA-XM7D8FG8839F7-KH773629DH6S                    A170A-MCJ-001

7. Therefore, after careful consideration of the evidence presented[3], this Arbitrator finds as follows:

i.   The Claimant as well as the Respondent(s) are consenting adults, having attained the age of the majority; not a minor, not an infant, not a delinquent, and/or a decedent. All parties are fully capable of entering into and negotiating contracts; and

ii.  I do not find any of the parties to be suffering from a mental disease and/or defect that would have prevented and/or interfered with their knowing and intentional entering into the binding contractual agreement; and

iii. The arbitration hearing was held on October 21,st 2019 at which time this Arbitrator reviewed all contractual agreements and documentary evidence submitted by the parties in this matter.

iv.  This Arbitrator fully considered and grated the Claimant's request of October 21st, 2019 for summary disposition and further considered all the evidence in reference to the contractual agreement.

v.   This Arbitrator finds that the Respondent(s) have failed to fully perform to the terms of the agreement and that the Claimant is entitled to immediate and unconditional remedy as prescribed within the terms of the contractual agreement; and

vi.  A prior relationship did not exist between the parties and the Respondent(s) had an obligation to respond to the reasonable request of the Claimant; and

vii. This arbitrator finds that the contractual agreement is binding on all parties, remains irrevocable and that the contractual agreement remains in effect as stipulated within the agreement until all the obligations are satisfied by the defaulting party. As of this day,

---

[3] *Singh v. Raymond James Fin. Servs., Inc.*, No. 13-cv-1323, 2014 WL 11370123, (S.D.N.Y. March 28, 2014). "[T]ypically, 'arbitrators need not explain their rationale for an award'" (quoting *Barbier v. Shearson Lehman Hutton Inc.*, 948 F.2d 117, 121 (2d Cir. 1991)).

SITCOMM ARBITRATION ASSOCIATION

SAA-XM7D8FG8839F7-KH773629DH6S                    A170A-MCJ-001

those obligations have not been satisfied and I hereby order the Respondent(s) to satisfy the obligations according to the terms of the contractual agreement, which is not inconsistent with this order; and

viii.   Retaliation or any sort of back lash will result in the claimant recovering retaliation damages equivalent to five (5) times the amount of actual damages, if any further injury is inflicted.

ix.   The Respondent(s) failed to provide proof that they have not received and/or been notified of the existence of the contractual agreement and of their right to waiver; and

x.   The Respondent(s) failed to respond to the contractual agreement mailed with proof of service by the Claimant on April 1, 2015 which constituted an act of "tacit acquiescence;" and

xi.   The Respondent(s) have failed to fully perform to the terms of the agreement and the Claimant is entitled to immediate and unconditional remedy as prescribed within the terms of the contractual agreement; and

8.  **Furthermore, this Arbitrator finds that the amount stipulated to be paid to the Claimant is $2,250,000.00 (Two Million Two Hundred Fifty Thousand U.S. Dollars and No Cents) from Respondent Penny Mac Loan Services, LLC ET AL., as stipulated according to the terms of the contractual agreement as agreed to by the parties; and**

9.  **The total combined award amount is $2,250,000.00 (Two Million Two Hundred Fifty Thousand U.S. Dollars and No Cents) as stipulated according to the terms of the contractual agreement as agreed to by the parties.**

10.  **The award amounts determined by the contract amount(s) (x3) Times Three.**

11.  The Respondent(s) have thirty (30) days from receipt of this Award to comply with the decision of this Arbitrator.  In the event that the Respondent(s) fail to comply with the decision of this Award, this Arbitrator may revisit this matter upon request of the Claimant and according to

the terms and conditions of the contractual agreement; to modify this Award in an amount equivalent to two times the determination of this Arbitrator for each Respondent.

12. The contract stated that any final and binding arbitration award may be confirmed in any United States District Court, pursuant to Title 9 of the United States Code §9 and §13. The Supreme Court has explained, "[t]here is nothing malleable about 'must grant,' which unequivocally tells courts to grant confirmation in all cases, except when one of the 'prescribed' exceptions applies."[4] A Judicial review of an arbitrator's award is extremely limited, and the court must accept the arbitrator's credibility determinations, even where there is conflicting evidence and room for choice exists.[5] "An arbitrator's award should not be vacated for errors of law and fact committed by the arbitrator and the courts should not attempt to mold the award to conform to their sense of justice."[6]

13. Claimant may seek confirmation of this arbitration Award in a United States District Court. Confirmation of an award is generally a "summary proceeding that merely makes what is already a final arbitration award a judgment of the court."[7]

14. This Award is final and binding between the Claimant and the Respondent(s) in the above referenced matter upon issuance and execution of this Arbitrator's signature below and full force and effect take place immediately upon issuance.

(REMAINDER OF PAGE LEFT INTENTIONALLY BLANK)

---

[4] *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 587 (2008).
[5] *Matter of Long Is. Ins. Co. v. Motor Vehicle Accident Indemnification Corp.*, 57 AD3d 670, 869 NYS2d 195 (2nd Dept., 2008). *White v. Roosevelt Union Free School District Board of Educ.*, 147 AD3d 1071, 48 NYS3d 220 (2nd Dept., 2017).
[6] *Aftor v. Geico Insurance Co.*, 110 AD3d 1062, 974 NYS2d 95 (2nd Dept., 2013).
[7] *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984).

SAA-XM7D8FG8839F7-KH773629DH6S                              A170A-MCJ-001

## NOTICE OF THE ISSUANCE OF THIS AWARD TO BE DELIVERED TO:

ORIGINAL:                                                  COPY:

CLAIMANT:                                                  RESPONDENT(S):

| | |
|---|---|
| Mark C. Johnson<br>451 May lane<br>Louisa County, VA. 23093 | Penny Mac Loan Services, LLC.<br>P.O. Box 660929<br>Dallas, TX 75266-0929 |
| EMAIL: potentateinname@protonmail.com | |

**SO, AWARDED.**
**Be it so this 21, day of October 2019.**

Arbitration Hearing Conducted by:  Kirk Gibbs

Hearing Site:  Lilburn, Georgia

/s/ *Kirk Gibbs*
ARBITRATOR

COMMITTEE MEMBER

IMPORTANT NOTICE:  Certification of services rendered.  The Original Arbitration Award is given to the Claimant to be
retained as private property. No Trespass. Certified Copies of the Original can only be issued with permission of
SITCOMM ARBITRATION ASSOCIATION.

**SITCOMM ARBITRATION ASSOCIATION**
P.O. Box 41964
Charleston, South Carolina
+ 1 (877) 631-1722

Website: saalimited.com                                        Email: support@saalimited.com          Page | 2

ALL-PURPOSE PROOF OF SERVICE

    I,   SITCOMM ARBITRATION ASSOCIATION, being at or above the age of 18, of the majority and not a party to the action, a citizen of the United States of America, did mail the document entitled:

              CERTIFIED COPY OF ARBITRATION AWARD
by placing it in an envelope addressed to: Name and address:

Mark C. Johnson
451 May lane
Louisa County, VA. 23093       USPS Tracking 9114 9023 0722 469 4715 23

Penny Mac Loan Services, LLC.
P.O. Box 660929
Dallas, TX 75266-0929       USPS Tracking  9114 9023 0722 4679 4715 16

    Affixing the proper postage and depositing it with the local postal carrier, also being of the age of the majority, and not a party to this action who upon receipt guarantees delivery as addressed and/or local dropbox guaranteeing the same as prescribed in law. If called upon I provide this sworn testimony based on first-hand knowledge of the aforementioned events attesting and ascribing to these facts on this day October 31, 2019.

              THE SITCOMM ARBITRATION ASSOCIATION

### SITCOMM ARBITRATION ASSOCIATION
**1001 South White Oak Road**
**White Oak, Texas 75693**
**+ 1 (877) 631-1722**

Website: saalimited.com                    Email: support@saalimited.com

# ALL-PURPOSE PROOF OF SERVICE

I,      SITCOMM ARBITRATION ASSOCIATION, being at or above the age of 18, of the

majority and not a party to the action, a citizen of the United States of America, did mail the

document entitled:                    FINAL ARBITRATION AWARD

by placing it in an envelope addressed to: Name and address:

Ronnie Louis Marvel Kahapea
11-2808 Kaleponi Drive
P.O. Box 875
Voclano, Hawaii 96785

Pennymac Loan Services, LLC
P.O. Box 30597
Los Angeles, California 90030

Plaza Home Mortgage, Inc.
P.O. Box 7168
Pasadens, California 91109

Affixing the proper postage and depositing it with the local postal carrier, also being of the age
of the majority, and not a party to this action who upon receipt guarantees delivery as addressed
and/or local dropbox guaranteeing the same as prescribed in law. If called upon I provide this
sworn testimony based on first-hand knowledge of the aforementioned events attesting and
ascribing to these facts on this day June 21, 2019.

                    THE SITCOMM ARBITRATION ASSOCIATION

EXHIBIT

19

# SITCOMM ARBITRATION ASSOCIATION

**1001 South White Oak Road**
**White Oak, Texas 75693**
**+ 1 (877) 631-1722**

Website: www.saalimited.com                    Email: support@saalimited.com

## Office of the Director

This Certification is not valid for use anywhere within the United States of America, its territories or possessions. This Certification does not certify the content of the document for which it is issued.

**I, Sandra Goulette, Director of SITCOMM Arbitration Association**, under and by virtue of the authority vested in me by the Federal Arbitration Act Title 9 Sections 1-9 of the United States Code, Do Hereby Certify that:

### MARK MOFFETT

This Arbitrator has created and executed the attached Arbitration Award, was on the date thereof, the duly qualified Arbitrator for SITCOMM Arbitration Association whose official acts as such should be given full faith and credit in all Courts and Justice and elsewhere.

**In Testimony Whereof**, I hereunto set my hand and have caused to be affixed a director's autograph, on this /2ᵗʰ day ∂ᵒ/ʔ year of ᶜᵗʰ month, in the year of our Lord.



SANDRA GOULETTE
SITCOMM ARBITRATION ASSOCIATION COMMITTEE MEMBER

No. SAA-191006-RK7652987-8VH389BSY-KAHAPEA

SAA-191006-RK7652987-8VH389BSY

A102A-RK-001

## SITCOMM ARBITRATION ASSOCIATION
### 1001 South White Oak Road
### White Oak, Texas 75693
### + 1 (877) 631-1722

Website: saalimited.com

Email: support@saalimited.com

## FINAL ARBITRATION AWARD

### Sitting in the following composition:

Committee Member:  **SANDRA GOULETTE**
Laurel, Mississippi

Arbitrator:  **MARK MOFFETT**
Laurel, Mississippi

In the Matter of the Arbitration Between the Following Parties:

RONNIE LOUIS MARVEL KAHAPEA, ET AL,

### CLAIMANT,

v.

Contract No.: SAARK-A102A-061019-MEM

PENNYMAC LOAN SERVICES, LLC, ET AL,

PLAZA HOME MORTGAGE, INC., ET AL

### RESPONDENT(S).

*9 UNITED STATES CODES §1, §2, AND §9*
*THE COMMON LAW*

SEALED.

SAA-191006-RK7652987-8VH389BSY

A102A-RK-001

IN THE MATTER OF THE ARBITRATION BETWEEN:

| | | |
|---|---|---|
| RONNIE LOUIS MARVEL KAHAPEA, ET AL, | § | |
| | § | |
| | § | **Contract No.: SAARK-A102A-061019-MFM** |
| **CLAIMANT(S),** | § | |
| v. | § | |
| | § | **9 UNITED STATES CODES** |
| PENNYMAC LOAN SERVICES, LLC., ET AL... | § | **§1, §2, AND §9** |
| | § | |
| PLAZA HOME MORTGAGE INC, ET AL | § | |
| | § | |
| **RESPONDENT(S).** | § | |
| | § | SEALED. |

## FINAL ARBITRATION AWARD

Breach or violation of required contract terms:

The parties have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this Title. If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made. Notice of the application shall be served upon the adverse party and thereupon the court shall have jurisdiction of such party as though they had appeared generally in the proceeding. If the adverse party is a resident of the district within which the award was made, such service shall be made upon the adverse party or their attorney as prescribed by law for service of notice of motion in an action in the same court. If the adverse party shall be a nonresident, then the notice of the application shall be served by the marshal of any district within which the adverse party may be found in like manner as other process of the court.[1]

Arbitrator's Name:      Mark Moffett

Hearing Location:      Laurel, Mississippi

This Arbitrator, Mark Moffett; having considered the Claimant's request for dispute resolution on complaint, finds the following:

Jurisdictional Allegations:

- This Arbitrator has Subject Matter Jurisdiction, SMJ; as acknowledged by 9 U.S.

Codes §1, §2, §9; 28 U.S. Code §§ 1346; and the established common law not limited to the following specifics:

a.      That Ronnie Louis Marvel Kahapea is a citizen of the state of Hawaii;

b.      That the Respondent(s)

    i. PENNYMAC LOAN SERVICES, LLC, ET AL,

---

[1] July 30, 1947, Ch. 392, 61 Stat. 672

ii. PLAZA HOME MORTGAGE, INC., ET AL

... Have entered into an agreement whereby they knowingly and intentionally agreed to
the following "... Failure and or refusal to respond and provide the requested and necessary Proof of
Claims shall be held and noted as agreed to by all parties, that a general response, a nonspecific
response, or a failure to respond with specificities and facts and conclusions of common law, and/or to
provide the requested information and documentation that is necessary and in support of the
agreement shall constitute a failure and a deliberate and intentional refusal to respond and as a
result thereby and/or therein, expressing the defaulting party's consent and agreement to said facts
and as a result of the self-executing agreement, the following is contingent upon their failure to
respond in good faith, with specificity, with facts and conclusions of common-law to each and every
averment, condition, and/or claim raised; as they operate in favor of the Claimant, through "tacit
acquiescence." Respondent(s) NOT ONLY expressly affirm the truth and validity of said facts set,
established, and agreed upon between the parties to the Conditional Acceptance for Value and
counter offer/claim for Proof of Claim, also Respondent(s); have agreed and consented to
Respondent(s) having a duty and obligation to provide the requested and necessary Proof of Claims
which has created and established for Respondent(s) an estoppel in this matter(s), and ALL,
matter(s) relating hereto; and arising necessarily therefrom; and

2.        The above-captioned matter was set for arbitration after the receipt of the application
and dispute resolution complaint on May 23, 2019; and

3.        This Arbitrator has notified all parties listed above (a copy of proof of notification is
permanently affixed to this record by reference) granting each party the opportunity to submit
documentation, records, proofs, evidence, exhibits, affidavits related to the instant matter, the
contract SEQ3OP-53719IUXZA95-PMKLI¹⁰, its terms, premises, promises, and obligations on or
about March 29, 2019; and

4.        The Respondent(s) in a related action have made a claim against the Claimant of this
instant matter related to the Claimant's interests and/or properties. There exists a matter in dispute
and/or controversy associated with the contractual agreement, thereby extending jurisdiction to this
body to proceed as per the terms of the agreement, as well as relevant laws and facts in support as
presented during the arbitration of this controversy; and

5.        The parties entered into a legally binding contractual relationship with each other and
this Arbitrator finds that there is no fraud and/or any attempt to induce fraud and/or to commit
fraud, and/or inducement of contract, and/or fraud in the factum respecting the instant matter and
contract. Thus, the parties are bound by the terms and obligations agreed upon and imposed upon
them as a direct result of the contractual agreement; and

6.      This Arbitrator finds that all the elements that form a contractual agreement and a legally commercial binding obligatory relationship are present; and

7.      The contract clearly expresses the method of settlement and resolution of all disputes arising thereunder shall be settled by arbitration under the authority of the standards of common-law arbitration, the Federal Arbitration Act, and further stipulated and appointed this Arbitrator listed herein as agreed upon as the Arbitrator of record. Neither party has objected, protested, and/or attempted to amend any portion and/or provision at any time of the contract; the contract status that all final and binding arbitration awards may be confirmed by any court in America having original jurisdiction pursuant to Title 9 United States Codes §9 and §13; and

8.      It has been alleged and thoroughly proven that the Respondent(s) listed above have by their own accord agreed to all the terms of the contract, that they have committed the offenses claimed in the contract and have acted against the interests of the Claimant's, depriving them of their right to property, their right to contract, the right to The Pursuit of Happiness and the enjoyment of life. They have admitted and agreed that they have violated the Claimant's constitutional and common law rights, that they had intentionally, knowingly and deliberately failed to perform as agreed, have forsook their obligatory duty of care and thus created a dispute that requires a resolution by SITCOMM ARBITRATION ASSOCIATION (Hereinafter "SAA") and/or any subsequent award; and

9.      The parties stipulated and agreed that the related matters including any judgments associated thereto, any claims, and any collateral attacks; by the Respondent(s) are null and void of any effect and shall not be binding on the Claimant retroactively and henceforth; and

10.     The contract stated that punitive damages can be optionally assessed, however; the contract remains silent as to any case that would direct the Arbitrator to direct a formula to determine punitive damages. It is deemed that punitive damages may be warranted if the Respondent(s) do not voluntarily comply with this award. In such an event, this Arbitrator may impose punitive damages at a rate of three times the amount of the actual damages in addition to other remedies awarded.[2]

11.     The parties did have a prior relationship and the Respondent(s) had an obligation to respond to the reasonable requests of the Claimant. One of those requests being that the Respondent(s) provide an accounting and that such accounting be truthful and certified as being wholly accurate. As the custodian of record, a position for which the Respondent(s) volunteered, accepted such responsibility and have yet to rebut such a presumption. This Arbitrator finds that they were duty-bound and have breached their fiduciary duty of care, supporting their willful and intentional as well as deliberate default respecting the irrevocable binding contractual agreement that is coupled with interests; and

---

[2] *Pacific Mutual Life Insurance Company vs. Haslip*, 499 US 1 (1991).

12.   Further, this Arbitrator finds that the contractual agreement does highlight and note a settlement offer whereby the parties stipulate within the body and framework of the agreement ("Contract" "Agreement") in line with the Tucker Act and have agreed to certain and specific terms under and in line with the contractual agreement; and

13.   There is complete diversity of citizenship between the parties; and

14.   The amount in controversy exceeds the sum of $75,000.00, exclusive of interest, costs, fees and assessments; and

This Arbitrator awards Claimant, Ronnie Louis Marvel Kahapea the sum of $ 600,000 Dollars (Six Hundred Thousand U.S. Dollars) from Respondents PENNEYMAC LOAN SERVICES, LLC and PLAZA HOME MORTGAGE, INC, ET AL; each bearing a 50% share of the burden for their breach of the contractual agreement of the parties; AND, this Arbitrator awards Claimant, Ronnie Louis Marvel Kahapea $ 1,200,000.00 (One Million Two Hundred Thousand U.S. Dollars) from Respondents PENNEYMAC LOAN SERVICES, LLC, ET AL and PLAZA HOME MORTGAGE, INC, ET AL as punitive damages under the treble damages provision of the agreement for their admitted deceptive and fraudulent business practices inherent in the loan and foreclosure racket and their breach of terms agreed upon.

The total amount of award to the Claimant is $ 1,800,000.00 (One Million Eight Hundred Thousand U.S. Dollars) according to the terms of the contractual agreements including treble damages and punitive damages, .

Each Respondent has thirty (30) days from receipt of this Award to comply with its terms and each Respondent is liable for 50% (Fifty per cent). In the event that either Respondent fails to comply with the decision of this Award, this Arbitrator may re-visit this matter to double the amount awarded to the defaulting party or parties as additional punitive damages.

15.   That the venue is proper in any court of original jurisdiction wherein either the Arbitrator resides or chosen by the Claimant as stipulated in the contractual agreement and that any orders compelling witness attendance, provisional remedies, equitable relief, interim awards are to be issued and enforced according to the terms of the contract as stipulated in the agreement; and

16.   That the parties have agreed that all pre-existing as well as existing contractual Agreements between the parties, no matter their scope, subject matter, and/or detail are superseded and extinguished by the contractual agreement referenced and related hereto; and

Should the Claimant elect, that jurisdiction for the final award may be had under the Tucker Act in the United States Court of Federal claims as the exclusive jurisdiction for said Court of Claims for damages against the United States under contract in excess of $10,000.00. Since this matter is against an institution registered and licensed with the United States, during the time of its conduct is construed as one and the same as a matter of law; the Federal Court of Claims would be at the

election of the Claimant, a chosen proper jurisdiction to have the matter determined under common-law and/or as stipulated in the contract at any court of original jurisdiction.

## BASIS FOR ARBITRATION:

17.     On or about March 29, 2019, the Claimant and the Respondent(s) entered into a written, self-executing, binding, irrevocable, contractual agreement coupled with interests, for the complete resolution of their misconvictions and other conflicts respecting their previous relationship. The Respondent(s) made an attempt to change the terms of that contractual agreement and the Claimant presented a counter offer or conditional acceptance of the offer to the Respondent(s). The record clearly documents that the Respondent(s) have failed to properly respond after they received the counter offer, whereby such nonresponse would equate to tacit acquiescence thereby creating an estoppel respecting the Respondent(s) and any future claims and/or prior claims and/or present claims associated with this instant matter.

18.     It appears that a dispute has arisen under the agreement between the parties and it is the subject matter at bar. The Claimant contends that after agreeing to the terms of the contract, the Respondent(s) have failed to fully perform to the terms of the agreement and that the Claimant is entitled to immediate and unconditional remedy as prescribed within the terms of the contractual agreement. The Claimant has demanded liquidation of the estate/trust and the Respondent(s) have failed to act.

19.     The contractual agreement stipulates that the Arbitrator may adjust the amount of the award to include fees, adjustments, costs, and other expenses.

20.     The contractual agreement provided for arbitration of disputes at SITCOMM ARBITRATION ASSOCIATION, which stated in relevant part:

That the arbitration process is binding on all parties and is the sole and exclusive remedy for redressing any issue associated with this agreement. That this agreement supersedes and predates as well as replaces any and all prior agreements between the parties, and is binding on all parties and irrevocable, and the parties agreed to the terms and conditions of this agreement upon default of the defaulting party as of the date of the default...

## ARBITRATION- AN ADMINISTRATIVE REMEDY COGNIZABLE AT COMMON-LAW

21.     ADDITIONALLY, it is exigent and of consequence for the Claimant to inform Respondent(s), in accordance with and pursuant to the principles and doctrines of "clean hands" and "good faith," that by Respondent(s) failure and/or refusal to respond and provide the requested and necessary Proof of Claims; it shall be held and noted and agreed to by all parties, that a general response, a nonspecific response, or a failure to respond with specificities and facts and conclusions of common law, and/or to provide the requested information and documentation that is necessary and in support of the agreement shall constitute a failure and a deliberate and intentional refusal to respond and as a result thereby and/or therein, expressing the defaulting party's consent and agreement to said

facts and as a result of the self-executing agreement, the following is contingent upon their failure to respond in good faith, with specificity, with facts and conclusions of common-law to each and every averment, condition, and/or claim raised; as they operate in favor of the Claimant, through "tacit acquiescence." Respondent(s) NOT ONLY expressly affirm the truth and validity of said facts set, established, and agreed upon between the parties to the Conditional Acceptance for Value and counter offer/claim for Proof of Claim and Respondent(s); have agreed and consented to Respondent(s) having a duty and obligation to provide the requested and necessary Proof of Claims which will create and establish for Respondent(s) an estoppel in this matter(s), and ALL matters relating hereto; and arising necessarily therefrom;

and,

22.     In accordance with and pursuant to this agreement; a contractually (consensual) binding agreement between the parties to the Conditional Acceptance for Value and counter offer/claim for Proof of Claim to include the corporate Government Agency/Department construct(s) whom Respondent(s) represents/serves; as well as, ALL officers, agents, employees, assigns, and the like in service to Respondent(s) will not argue, controvert, oppose, or otherwise protest ANY of the facts already agreed upon by the parties set and established herein; and necessarily and of consequence arising therefrom, in ANY future remedial proceeding(s)/action(s), including binding arbitration and confirmation of the award in the District Court of the United States at any competent court under original jurisdiction, in accordance with the general principles of non-statutory Arbitration, wherein the Conditional Acceptance for the Value/Agreement/Contract no. SEQ3OP-53719JUXZA95-PMKL1© constitutes an agreement of all interested parties in the event of a default and acceptance through silence/failure to respond when a request for summary disposition of any claims or particular issue may be requested and decided by the Arbitrator, whereas a designated Arbitrator was chosen at random, who is duly authorized, and in the event of any physical or mental incapacity to act as Arbitrator, the Claimant shall retain the authority to select any neutral(s)/Arbitrator(s) that qualify pursuant to the common law right to arbitration, as the arbitration process is a private remedy decided upon between the parties and with respect to this contractual agreement; the defaulting party waives any and all rights, services, notices, and consents to the Claimant and or the Claimant's representative selection of the Arbitrator thereby constituting agreement and any controversy or claim arising out of or relating in any way to this Agreement or with regard to its formation, interpretation or breach, and any issues of substantive or procedural arbitrability shall be settled by arbitration, and the Arbitrator may hear and decide the controversy upon evidence produced although a party who was duly notified of the arbitration proceeding did not appear; that the Claimant deems necessary to enforce the "good faith" of ALL parties hereto within without respect to venue, jurisdiction, law, and forum the Claimant deems appropriate. "An arbitrator's

award should not be vacated for errors of law and fact committed by the arbitrator and the courts should not attempt to mold the award to conform to their sense of justice."[3]

22.     Further, Respondent(s) agree that the Claimant can secure damages via financial lien on assets, properties held by them or on their behalf for ALL injuries sustained and inflicted upon the Claimant for the moral wrongs committed against the Claimant as set, established, agreed and consented to herein by the parties hereto, to include but not limited to: constitutional impermissible misapplication of statute(s)/law(s) in the above referenced alleged Commercial/Civil/Cause; fraud, conspiracy (two or more involved); trespass of title, property, and the like; and, ALL other known and unknown trespasses and moral wrongs committed through ultra vires act(s) of ALL involved herein; whether by commission or omission. Final amount of damages to be calculated prior to submission of Tort Claim and/or the filing of lien and the perfection of a security interest via a Uniform Commercial Code Financing One (1) Statement; estimated in excess of TEN (10) Million dollars (USD) or other lawful money or currency generally accepted with or by the financial markets in America) and notice to Respondent(s) by invoice. Per Respondent(s) failure and/or refusal to provide the requested and necessary Proof of Claims and thereby; and therein consenting and agreeing to ALL the facts set, established, and agreed upon between the parties hereto, shall constitute a self-executing binding irrevocable durable general power of attorney coupled with interests. This Conditional Acceptance for Value and counter offer/claim for Proof of Claim becomes the security agreement under commercial law whereby only the non-defaulting party becomes the secured party, the holder in due course, the creditor in and at commerce. It is deemed and shall always and forever be held that the Claimant and all property, interest, assets, estates, trusts commercial or otherwise shall be deemed consumer and household goods not-for-profit and or gain, private property, and exempt, not for commercial use, nontaxable as defined by the Uniform Commercial Code Article 9 §102 and Article 9 §109 and shall not in any point and/or manner, past, present and/or future be construed otherwise; see the Uniform Commercial Code Articles 3, 8, and 9.

23.     Respondent(s) have allowed the ten (10) Calendar days or twenty (20) Calendar days total if request was made by signed written application for the additional ten (10) Calendar days to elapse without providing the requested and necessary Proof of Claims for which Respondent(s) have entered into fault and the Claimant has transmitted a Notice of Fault and Opportunity to Cure and Contest Acceptance to the Respondent(s); wherein Respondent(s) were given an additional three (3) days (72 hours) to cure Respondent(s) fault. Respondent(s) failed or otherwise refused to cure Respondent(s) fault and Respondent(s) are found in default and thereby; and therein, Respondent(s) have established Respondent(s) consent and agreement to the facts contained within the Conditional Acceptance for Value and counter offer/claim for Proof of Claim as said facts operate in favor of the Claimant; e.g., that the judgment of alleged "court of record" within the above referenced alleged

[3] *Aftor v. Geico Insurance Co.*, 110 AD3d 1062, 974 NYS2d 95 (2nd Dept., 2013).

Commercial/Civil/Cause is VOID AB INITIO for want of subject matter jurisdiction of said venue; insufficient document (Information) and affidavits in support thereof for want of establishing a claim of debt; want of Relationship with the "source of authority" for said statute(s)/law(s) for want of privity of contract, or contract itself; improperly identified parties to said judgment, as well as said dispute/matter; and,

24.     Respondent(s) agreed and consented that Respondent(s) do have a duty and obligation to Claimant; as well as the corporate Government Department/agency construct(s) Respondent(s) represents/serves, to correct the record in the alleged Commercial/Civil/Cause and thereby; and therein, release the indenture (however termed/styled) upon the Claimant and cause the Claimant to be restored to liberty and release the Claimant's property rights, as well as ALL property held under a storage contract in the "name" of the all-capital-letter "named" defendant within the alleged Commercial/Civil/Cause within the alleged commercially "bonded" warehousing agency d.b.a., for the commercial corporate Government construct d.b.a. the United States. That this arbitration award is to be construed contextually and not otherwise and that if any portion and/or provision contained within this arbitration award, the self-executing binding irrevocable contractual agreement coupled with interests; is deemed non-binding it shall in no way affect any other portion of this arbitration award. That this Arbitrator is permitted and allowed to adjust the arbitration award to no less than two times the original value of the properties associated with this agreement, plus the addition of fines, penalties, and other assessments that are deemed reasonable to the Arbitrator upon presentment of such claim, supported by prima facie evidence of the claim.

24.     The defaulting party will be estopped from maintaining or enforcing the original offer/presentment; i.e., the above referenced alleged Commercial/Civil/Cause as well as ALL commercial paper (negotiable instruments) therein, within any court or administrative tribunal/unit within any venue, jurisdiction, and forum the Claimant may deem appropriate to proceed within in the event of ANY and ALL breach(s) of this contractual agreement by Respondent(s) to compel specific performance and or damages arising from injuries therefrom. The defaulting party will be foreclosed by laches and/or estoppel from maintaining or enforcing the original offer/presentment in any mode or manner whatsoever, at any time, within any proceeding/action.

25.     Furthermore, the Respondent(s) are foreclosed against the enforcement, retaliation, assault, infringement, imprisonment, trespass upon the rights, properties, estate, person whether legal, natural or otherwise of the presenter/petitioner and/or his interest and/or his estate retroactively, at present, post-actively, forever under any circumstances, guise, and/or presumption.

### NOTICE OF COMMON-LAW ARBITRATION:

26.     Please be advised that in-as-much as the Claimant has "secured" the "interest" in the "name" of the all-capital-letter "named" defendant as employed/used upon the face; and within, ALL documents/instruments/records within the alleged Commercial/Civil/Cause, to include any and all

derivatives and variations in the spelling of said "name" except the "true name" of the Claimant,
through a Common-Law Copyright, filed for record within the Office of the Secretary of State and
having "perfected said interest" in same through incorporation within a Financing (and all
amendments and transcending filings thereto), by reference therein, the Claimant hereby and
herein, waives the Claimant's rights as set, established, and the like therein, and as "perfected"
within said Financing Statement acting/operating to "register" said Copyright, to allow for the
Respondent(s) to enter the record of the alleged "court of record" within the alleged
Commercial/Civil/Cause for the SOLE purpose to correct said record and comply with Respondent(s)
agreed upon duty/obligation to write the "order" and cause same to be transmitted to restore and
release the Claimant, the Claimant's corpus and ALL property currently under a "storage contract"
under the Claimant's Common-Law Copyrighted trade name; i.e., the all-capital-letter "named"
defendant within the above referenced alleged Commercial/Civil/Cause, within the alleged
commercially "bonded" warehousing agency d.b.a. the commercial corporate Government juridical
construct d.b.a. the United States. Please take special note, that the copyright is with reference to
the name and its direct association and/or correlation to the presenter.

27.    NOTICE: The Arbitrators, "Must not necessarily judge according to the strict law but as a
general rule ought chiefly to consider the principles of practical business."[4]

•      "Internationally accepted principles of law governing contractual relations."[5]

•      If the contract (valid or otherwise) contains an arbitration clause, then the proper forum to
       determine whether the contract is void or not, is the arbitration tribunal.[6]

•      That any determination by the Arbitrator is binding upon all parties, and that all parties
       agree to abide by the decision of the Arbitrator. The Arbitrator is to render a decision based
       upon the facts and conclusions as presented within the terms and conditions of the contract.
       Any default by any party must be supported by proof and evidence of said default, that
       default shall serve as tacit acquiescence on behalf of the party who defaulted as having
       agreed to the terms and conditions associated with the self-executing binding irrevocable
       contract coupled with interests. That the Arbitrator is prohibited from considering and/or
       relying on statutory law, as it has been held that any time any party relies on or enforces a
       statute, they possess no judicial power.

•      "A judge ceases to set as a judicial officer because the governing principals of administrative
       law provides that courts are prohibited from substituting their evidence, testimony, record,
       arguments and rationale for that of the agency. Additionally, courts are prohibited from their
       substituting their judgments for that of the agency."[7]

[4] *Norske Atlas Insurance Co v London General Insurance Co* (1927) 28 Lloyds List Rep 104.
[5] *Deutsche Schachtbau v R'As al-Khaimah National Oil Co* (1990) 1 AC 295.
[6] *Heyman v Darwins Ltd.* (1942) AC 356.
[7] *AISI v US*, 568 F2d 284.

- "...Judges who become involved in enforcement of mere statutes (civil or criminal in nature and otherwise), act as mere "clerks" of the involved agency..."[8]

- "...Their supposed 'court' becoming thus a court of limited jurisdiction' as a mere extension of the involved agency for mere superior reviewing purposes."[9] "When acting to enforce a statute, the judge of the municipal court is acting an administrative officer and not as a judicial capacity; courts in administrating or enforcing statutes do not act judicially, but, merely administerially."[10]

- "It is basic in our law that an administrative agency may act only within the area of jurisdiction marked out for it by law. If an individual does not come within the coverage of the particular agency's enabling legislation the agency is without power to take any action which affects him."[11]

  "It is not every act, legislative in form, that is law. Law is something more than mere will be exerted as an act of power...Arbitrary power, enforcing its edicts to the injury of the person and property of its subjects is not law." [12]

- Some of the aforementioned cases are not published, however; these are still fundamental principles of law, and one of the fundamental principles of arbitration is that the Arbitrator sits as judge over the facts, and as such to preserve the sanctity of the process and Arbitrator receives the same immunity as a judge and is exempt from prosecution and or review, unless they can be proved that the Arbitrator intentionally ignored the evidence and acted in conspiracy to defraud the parties.

28.     As the Claimant has no desire NOR wish to tie the hands of Respondent(s) in performing Respondent(s) agreed upon duty/obligation as set, established, and agreed upon within this Conditional Acceptance for Value and counter offer/claim for Proof of Claim and thereby create/cause a "breach" of said contractually binding agreement on the part of the Respondent(s), Respondent(s) is hereby; and herein, NOTICED that if this waiver of said Copyright is not liberal, NOR extensive enough, to allow for the Respondent(s) to specifically perform all duties/obligations as set, established, and agreed upon within the Conditional Acceptance for Value and counter offer/claim for Proof of Claim; Respondent(s) may, in "good faith" and NOT in fraud of the Claimant, take all needed and required liberties with said Copyright and this waiver in order to fulfill and accomplish Respondent(s) duties/obligations set, established, and agreed upon between the parties to this agreement.

29.     If Respondent(s) has any questions and or concerns regarding said Copyright and or the waiver, Respondent(s) is invited to address such questions and or concerns to the Claimant in

---

[8] K.C. Davis, ADMIN. LAW, Ch. 1 (CTP West's 1965 Ed.)
[9] K.C. Davis, ADMIN. LAW, P. 95, (CTP, 6 Ed. West's 1977) *FRC v G.E.* 281 US 464, *Keller v PE*, 261 US 428.
[10] *Thompson v Smith*, 155 Va. 376, 154 SE 583, 71 ALR 604.
[11] *Endicott v Perkins*, 317 US 501
[12] *Hurtado v California* (1884) 110 US 515 (1984)

writing and causing said communiqués to be transmitted to the Claimant and below named
Notary/Third Party. The respondents have acted as if the contract quasi or otherwise does not place
a binding obligation upon their persons, upon their organizations, upon their institutions, upon their
job qualifications, and breaching that obligation breaches the contract, for which they cannot address
due to the direct conflict of interest. It is as a result of that conflict of interest that binding
arbitration shall be instituted.

30.     Your failure to respond, and this would include each of the Respondent(s) by their
representative, and if represented by the Attorney General, such representation must be responsive
for each State and/or State organization/department/agency, separately and severally to each of the
points of averment, failure to respond to a single point of averment will constitute acquiescence,
forfeiture, and a waiver of all rights with respects all of the points raised in this presentment.

31.     Pursuant to the terms of the contractual agreement the Claimant has provided proof that
they have attempted to communicate with the Respondent(s) for compliance of the contractual
agreement and have exhausted the requirements of the contractual agreement in that regard.

32.     The Respondent(s) have agreed and consented to binding arbitration under the terms
of the contractual agreement and have waived all rights to vacate, modify, appeal, contest, or
collaterally attack the decision, rulings, orders, remedies, and/or award (both interim and final) of
this Arbitrator.

**THE FEDERAL ARBITRATION ACT Application:**

33.     Pursuant to the contractual agreement's arbitration clause, the agreement evidences a
transaction involving or affecting "commerce," within the meaning of Article 9 United States Code
Subsection 1, and that the facts attributable to the claimant's in the underlying associated
matters/cause/actions are associated with the use of instrumentalities as described in the foreign
sovereign immunities act or otherwise affected "commerce among the several states" within the
meaning of the statute and Article 9 United States Code § 1.

34.     DUE TO THE FACT THAT THE CONTRACTUAL AGREEMENT IS A BINDING
IRREVOCABLE CONTRACT WHICH AFFECTS "COMMERCE," THE ARBITRATION
PROVISIONS CONTAINED WITHIN IT ARE "VALID, IRREVOCABLE AND ENFORCEABLE
WITHIN THE MEANING OF 9 UNITED STATESS CODE SUBSECTION 2.

35.     "Valid, Irrevocable and Enforceable" arbitration agreements and the orders, rulings,
decisions, remedies, and award made therefrom may be enforced in the United States courts by way
of confirmation and entry of a judgment of the court within the meaning of the statute and Article 9
United States Codes § 9 and §13. The supreme court has explained, "[t]here is nothing malleable
about 'must grant,' which unequivocally tells courts to grant confirmation in all cases, except when

one of the 'prescribed' exceptions applies."[13]   Confirmation of an award is generally a "summary

proceeding that merely makes what is already a final arbitration award a judgment of the court."[14]

36.     It was held by the supreme court that "the 'wholly groundless'[15] exception to

arbitrability is inconsistent with the federal arbitration act and this court's precedent. Under the act,

arbitration is a matter of contract, and courts must enforce arbitration contracts according to their

terms.[16] The parties to such a contract may agree to have an arbitrator decide not only the merits of

a particular dispute, but also "'gateway' questions of 'arbitrability.'" Therefore, when the parties'

contract delegates the arbitrability question to an arbitrator, a court may not override the contract,

even if the court thinks that the arbitrability claim is wholly groundless."[17]

### PROCEDURES ON ARBITRATION PROCEEDINGS:

37.     The Claimant is seeking equitable relief and monetary damage relief from the Respondent(s)

and that the parties have agreed that arbitration proceedings should be bifurcated into separate

phases: Phase One (1) should address the claims for monetary damages; and Phase Two (2) should

address the claims for equitable relief.

38.     The parties have stipulated that any court of original jurisdiction may enforce the

provisions of Phase Two (2) equitable relief awarded by the Arbitrator.

39.     The Arbitrator shall have the exclusive jurisdiction for the enforcement of any and all

matters associated with Phase One (1) monetary damage relief.

40.     Due to time constraints and the paramount danger affecting the public interest,

justice, and due process; the parties' consented and applied for the arbitration proceedings to

commence without delay.

41.     First set of claims' (due to the extensive nature of the claims, each of the claims by the

Claimant is incorporated herein by reference) ...

☐     The record shall reflect and note that the Claimant has attached a copy of the original

contract which list all the claims within the form of stipulation, that the parties have all agreed to,

and that they have incorporated each of those claims by reference. This Arbitrator finds that such

incorporation is appropriate and accepts that incorporation as a matter of record.

☐     As noted above, the Claimant has alleged that the Respondent(s) have breached the

contractual agreement and because the agreement is binding on all parties and was irrevocable; the

Respondent(s) have acted in bad faith, with unclean hands, and have breached their fiduciary duty of

care, responsibilities and are liable to the Claimant for the amount of the contractual agreement,

plus additional costs, fees, assessments, penalties, and other equitable relief remedies.

☐     That the Respondent(s) have agreed to discontinue all use of the Claimant's

[13] *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 587 (2008)
[14] *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984).
[15] *Henry Schein, Inc., et al v. Archer & White Sales, Inc.* (2019).
[16] *Rent-A-Center, West, Inc. v. Jackson*, 561 US 63, 67
[17] Ibid.

personal information, assets, properties, within its publication, its databases, its system of record keeping, and to have surrendered all records associated with this matter to the Claimant and have failed to do so as agreed.

☐      That the Respondent(s) have agreed to compensate the Claimant for their gross misrepresentation of facts and other information pertinent to the welfare and well-being of the Claimant. Respondent(s) have failed to provide such compensation as agreed and have failed to provide any documentation which would substantiate their having complied with this requirement of the contractual agreement.

☐      That the Claimant has agreed and accepted the fact that the United States has declared a national banking emergency which is supported by the "EMERGENCY ECONOMIC BANKING RELIEF ACT," "PROCLAMATION 2038, 2039, and 2040," and the "NATIONAL EMERGENCIES ACT," which resulted in the suspension of all normal banking activities and have agreed that any claim of debt by the Respondent(s) is fraudulent, and that they willfully attempted and committed fraud against the Claimant.

☐      That the Respondent(s) have agreed that THE NATIONAL BANKING HOLIDAY permits them to issue what's known as emergency script as prescribed by the March 9, 1933 Act (the reference notes of Congress lend to this conclusion), have agreed to issue book keeping entry credit and/or tax credits to the Claimant in the amount of the initial claim and owe Claimant as much as treble damages associated with the initial claim.

☐      The Respondent(s) have further agreed to turn over any and all properties, assets, securities, documents, accounting records to the claimant's upon demand/default and have failed and/or refused to do so, thus putting them in further breach in violation of the contractual agreement, entitling the Claimant to equitable relief.

**The findings and determination of THIS ARBITRATOR:**

41.      It is the determination of this Arbitrator that the following are facts that are undisputed and uncontroverted:

a.      That there is a binding irrevocable contractual agreement that has been coupled with interests that exist between the parties.

b.      That the parties had a pre-established relationship which placed an obligation on each to communicate with the other.

c.      That the Respondent(s) have made changes to the original agreement which permitted and allowed the Claimant to present a counter offer and/or conditional acceptance of the offer to change the agreement to the Respondent(s).

d.      That the self-executing binding contract coupled with interests stands as irrevocable.

e.      That the Respondent(s) have agreed to the contract, agreed to all the terms and

conditions of the contract by their acceptance of the waiver which was included as part of the contractual agreement; that waiver being the right not to respond as highlighted by the Supreme Court of the United States·

42.     "Due process requires, at a minimum; that an individual be given a meaningful opportunity to be heard prior to being subjected by force of law to a significant deprivation. . . . That the hearing required by due process is subject to waiver and is not fixed in form does not affect its root requirement that an individual be given an opportunity for a hearing before he is deprived of any significant property interest . . . "[18]

43.     "In the latter case[19] we said that the right to be heard 'has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest.'[20] The Respondent(s) have failed to provide proof that they have not received and/or been notified of the existence of the contract and of their right to waiver.

44.     The Respondent(s) failure to respond constituted an act of "tacit acquiescence."

45.     Respondent(s) have failed and/or refused to respond and provide the requested and necessary Proof of Claims as requested by the Claimant. Therefore, it shall be held, noted and agreed to by all the parties; that a general response, a nonspecific response, or a failure to respond with specificities and facts and conclusions of common law, and/or to provide the requested information and documentation that is necessary and in support of the agreement shall constitute a failure and a deliberate and intentional refusal to respond and as a result thereby and/or therein, expressing the defaulting party's consent and agreement to said facts and as a result of the self-executing agreement, the following is contingent upon their failure to respond in good faith, with specificity, with facts and conclusions of common·law to each and every averment, condition, and/or claim raised; as they operate in favor of the Claimant, through "tacit acquiescence." Respondent(s) NOT ONLY expressly affirm the truth and validity of said facts set, established, and agreed upon between the parties to the Conditional Acceptance for Value and counter offer/claim for Proof of Claim, but also Respondent(s) have agreed and consented to Respondent(s) having a duty and obligation to provide the requested and necessary Proof of Claims which will create and establish for Respondent(s) an estoppel in this matter(s), and ALL matters relating hereto; and arising necessarily therefrom...

and

46.     Respondent(s) have waived all rights, claims, defenses, and/or standing respecting the matter and is estopped from any collateral attacks and/or seeking disposition from any other venue as a result of the knowing, intentional and deliberate consent to the contractual agreement.

---

[18] *Boadine v. Appellate Department*, 1971, 5 C3d 536, 550.
[19] *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306
[20] *Snadach v. Family Finance Corp.*, 395 U.S. 337, 339, 340

a.  This Arbitrator finds that the pre-existing relationship with a change of terms opened the door for the conditional acceptance of an offer to re-contract and tender of payment was made. All the necessary elements that form a contractual agreement and a legally binding obligatory commercial relationship are present and dates of documents and proofs of service are within appropriate limits.

b.  Claimant served adequate notice in the agreement of the change of terms, cancellation of the debt, and cancellation of all pre-existing conditions and Respondents willfully chose to ignore the notice at their own peril.

c.  Since the property backing the alleged debt is under the class of "government obligations," payment in like kind to the money loaned when tendered is deemed sufficient to discharge the debt under the dictates of statute. The contractual agreement gives instruction for processing the payment through Federal Reserve Banks and is not left to discretionary interpretation by Respondents and their representative employees and agents.

d.  The contractual agreement clearly expresses the method of settlement and resolution of all disputes to be by arbitration under the authority of the standards of common-law arbitration and the Federal Arbitration Act. The agreement stipulates and appoints this Arbitrator and Sitcom Arbitration Association to resolve the dispute which arises from Respondents refusal to provide an accurate accounting that shows credit entry bookkeeping as an acceptable form of credit. Neither party has objected, protested, and/or attempted to amend any portion and/or provision at any time of the contractual agreement. The contractual agreement stated that all final and binding arbitration awards may be confirmed by any court in America having original jurisdiction pursuant to Title 9 United States Codes §9 and §13.

e.  The contract states that punitive damages can be optionally assessed, however; the contractual agreement remains silent as to any case that would direct the Arbitrator to a formula to determine punitive damages. It is deemed that punitive damages may be warranted if the Respondent(s) do not voluntarily comply with this award. In such an event, the Arbitrator imposes punitive damages at a rate of three times the amount of the actual damages in addition to other remedies awarded.

f.  The Claimants contend that after agreeing to the terms of the contract, the Respondent(s) have failed to fully perform to the terms of the contractual agreement and that the Claimants are entitled to immediate and unconditional remedy as prescribed within the terms of the contractual agreement.

47.  The Respondent(S) have thirty (30) days from receipt of this Award to comply with the decision of this Arbitrator. In the event that the Respondent(s) fails to comply with the decision of this Award, this Arbitrator may re-visit this matter to award the Claimant with punitive damages.

48.  The Supreme Court has explained, "[t]here is nothing malleable about 'must grant,'

which unequivocally tells courts to grant confirmation in all cases, except when one of the 'prescribed' exceptions applies."[21]   A Judicial review of an arbitrator's award is extremely limited, and the court must accept the arbitrator's credibility determinations, even where there is conflicting evidence and room for choice exists.[22]   "An arbitrator's award should not be vacated for errors of law and fact committed by the arbitrator and the courts should not attempt to mold the award to conform to their sense of justice."[23]

49.      This order shall be binding on all the parties, in all jurisdictions, and shall take precedent over all collateral and/or related matters heretofore, at present and forthwith until the agreement is fully satisfied. The Respondent(s) are estopped from maintaining and/or bringing forth any action against the Claimant, the Claimant's heirs, and/or the Claimant's properties permanently. This order shall constitute a permanent injunction against the Respondent(s) respecting the Claimant's and the Claimant's interest; comprised and embodied within the contractual agreement.

50.      The Respondent(s) are hereby ordered to release the demanded information of the Claimant which includes a full review and audit of all revenue for the estate/trust over the past ten (10) years, any tax credits and/or deductions associated with the estate/trust, a copy of any insurance policies associated with the estate/trust and a copy of any bonds held in respect to the estate/trust. The purpose of this information shall be for the Claimant to liquidate any and all assets of the estate/trust; and

51.      The Respondent(s) are hereby ordered to release any and all claims against any and all properties of the Claimant's, to return any and all properties held in any manner, to include records, documents, audiotapes, discoveries, exculpatory or otherwise, and that this order/mandate shall not be construed other than its intent and its contextual rendering.

52.      Accordingly, Justice Kavanaugh of the Supreme Court expressed his opinion as "We must interpret the Act as written, and the Act in turn requires that we interpret the contract as written. When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue. That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless."[24]

53.      Further, Kavanaugh continued; "That conclusion follows not only from the text of the Act but also from precedent. We have held that a court may not "rule on the potential merits of the underlying" claim that is assigned by contract to an arbitrator, "even if it appears to the court to be frivolous."[25] A court has "'no business weighing the merits of the grievance'" because the "'agreement

---

[21] *Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 587 (2008).
[22] *Matter of Long Is. Ins. Co. v. Motor Vehicle Accident Indemnification Corp*, 57 AD3d 670, 869 NYS2d 195 (2nd Dept. 2008)  *White v. Roosevelt Union Free School District Board of Educ.*, 147 AD3d 1071, 48 NYS3d 220 (2nd Dept., 2017).
[23] *After v. Geico Insurance Co.*, 110 AD3d 1062, 974 NYS2d 95 (2nd Dept., 2013).
[24] *Henry Schein, Inc., et al. v. Archer & White Sales, Inc.* (2019).
[25] *AT&T Technologies, Inc. v. Communications Workers*, 475 U. S. 643, 649–650 (1986).

is to submit all grievances to arbitration, not merely those which the court will deem meritorious.'"[26]

AT&T Technologies principle applies with equal force to the threshold issue of arbitrability. Just as a

court may not decide a merits question that the parties have delegated to an arbitrator, a court may

not decide an arbitrability question that the parties have delegated to an arbitrator.

**This award is consistent with the following:**

54.        5 U.S. Code § 572 · General authority

(a) An agency may use a dispute resolution proceeding for the resolution of an issue in controversy

that relates to an administrative program, if the parties agree to such proceeding.

(b)An agency shall consider not using a dispute resolution proceeding if—

(1) A definitive or authoritative resolution of the matter is required for precedential value, and such

a proceeding is not likely to be accepted generally as an authoritative precedent;

(2) The matter involves or may bear upon significant questions of Government policy that require

additional procedures before a final resolution may be made, and such a proceeding would not likely

serve to develop a recommended policy for the agency;

(3) Maintaining established policies is of special importance, so that variations among individual

decisions are not increased and such a proceeding would not likely reach consistent results among

individual decisions;

(4) The matter significantly affects persons or organizations who are not parties to the proceeding;

(5) A full public record of the proceeding is important, and a dispute resolution proceeding cannot

provide such a record; and

(6) The agency must maintain continuing jurisdiction over the matter with authority to alter the

disposition of the matter in the light of changed circumstances, and a dispute resolution proceeding

would interfere with the agency's fulfilling that requirement.

(7) Alternative means of dispute resolution authorized under this subchapter are voluntary

procedures which supplement rather than limit other available agency dispute resolution

techniques.[27]

55.        The Claimant and Respondent(s) have agreed that this private contractual agreement

involving private parties has no bearing on the public and/or the SITCOMM ARBITRATION

ASSOCIATION'S policies and/or procedures, and that the award is consistent with the terms of the

agreement and the general principles of arbitration that have been delineated through the annuals a

time.

56.        That the contractual agreement between the parties was specific to the parties only and did

not involve any nonrelated party and/or entity, does not affect government and/or its abilities to

carry out its functions, policies, and/or procedures. That the parties saw arbitration as an alternative

---

[26] *Steelworkers v. American Mfg. Co.*, 363 U. S. 564, 568 (1960).
[27] Added Pub. L. 101–552, § 4(b), Nov. 15, 1990, 104 Stat. 2739, § 582, renumbered § 572, Pub. L. 102–354, § 3(b)(2), Aug. 26, 1992, 106 Stat. 944.

remedy and agree to the alternative remedy within the construct of the binding irrevocable contractual agreement that remains coupled with interests.

57.      That the term and/or phrase agency as defined by the statute does not apply to the parties and their private contractual matters.  • (1)"agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include— (A) the Congress; (B) the courts of the United States; (C) the governments of the territories or possessions of the United States; (D) the government of the District of Columbia; (E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them; (F) courts martial and military commissions; (G) military authority exercised in the field in time of war or in occupied territory; or (H) functions conferred by: subchapter II of; or sections 1884, 1891–1902, and former appendix; 1.

(a) that none of the following cases apply wherein the award may be vacated—

(1) As this Arbitrator relied upon the facts and evidence[28] presented and that the award was not procured by corruption, fraud, or undue means; and/or

(2) That no aspect of the parties political affiliation, sexual orientation, gender, religious Association, and/or otherwise partiality or corruption are present in the Arbitrators, or and/or the issuance of this award; and/or

(3) The Arbitrator is not guilty of misconduct in refusing to postpone the hearing, as each party was given an opportunity to have such a hearing postponed whether or not they provided sufficient cause, or and that there was in no case a refusal to hear evidence pertinent and material to the controversy; or any misbehavior by which the rights of any party could be perceived as having been prejudiced; and/or

(4) That the Arbitrator operated only within the powers delegated by the contractual agreement, powers that were detailed in the agreement, and to the best of the Arbitrator's ability have perfectly executed those powers to the extent that a mutual, final, and definite award upon the subject matter submitted has been rendered.  Title 5 §572 has been complied with by this Arbitrator and SITCOMM ARBITRATION ASSOCIATION.

58.      That this award may only be modified under the following circumstances —

(a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award, the Arbitrator relied on the contract and the amount specified within the agreement; and

(b) Where the Arbitrators may have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted, the Arbitrator has relied upon the evidence presented and the contractual agreement and terms specified therein; and

---

[28] *Singh v. Raymond James Fin. Servs., Inc.*, No. 13-cv-1323, 2014 WL 1137023, (S.D.N.Y. March 28, 2014)  "[T]ypically, 'arbitrators need not explain their rationale for an award'" (quoting *Barbier v. Shearson Lehman Hutton Inc.*, 948 F.2d 117, 121 (2d Cir. 1991)).

SAA-191006-RK7652987-8VH389BSY                                      A102A-RK-001

(c) Where the award is imperfect in matter of form not affecting the merits of the controversy. This Arbitrator may modify and correct the award, so as to affect the intent thereof and promote justice between the parties, the Arbitrator has intended to promote justice, fairness, and render due process between the parties irrespective of the Arbitrator's personal opinion, rationale, arguments and/or disposition.

59.     It shall be forever known and stated, that this Arbitrator relied on the evidence presented and the intentions of the contract; and not otherwise. That I am duly appointed by the parties as stipulated in the agreement and as per the law this order is binding on all parties and I have come to the conclusions stated herein based on the facts and the evidence presented at the time of this arbitration award. This decision and/or rendering is not interim, that this is a final decree and judgment by this Arbitrator shall remain in effect and enforced as un-amendable immediately upon issuance.

NOTICE OF THE ISSUANCE OF THE AWARD TO BE DELIVERED TO:

ORIGINAL:                           COPIES:

CLAIMANT                            RESPONDENT(S)

Ronnie Louis Marvel Kahapes        PENNYMAC LOAN SERVICES, LLC, ET AL
11-2808 Kaleponi Drive             P.O.Box 30597
P.O. Box 875                       Los Angeles, CA 90030-0597
Voclano, Hawaii 96785

                                   PLAZA HOME MORTGAGE, INC, ET AL
                                   P.O. Box 7168
                                   Pasadena, CA 91109-7168

Email: bloodwolf80@gmail.com

SO, AWARDED.

Be it so this 10th day June 2019.

At: Laurel, Mississippi

Printed Arbitrators Name: MARK MOFFETT

Arbitrator's Signature: _____

Printed Name of Committee Member: SANDRA GOULETTE

Committee Member's Signature: _____

IMPORTANT NOTICE: Certification of services rendered. The Original Arbitration Award is given to the Claimant to be retained as private property. No Trespass. Certified Copies of the Original can only be issued with permission of SITCOMM ARBITRATION ASSOCIATION.